STATE OF CONNECTICUT *v.* ROBERT P. MARION

STATE OF CONNECTICUT *v.* MICHAEL P. TETREAULT

STATE OF CONNECTICUT *v.* HARRY E. COMAN

COTTER, BOGDANSKI, SPEZIALE, HEALEY and PARSKEY, Js.

Argued February 14—decision released May 30, 1978

*James J. Murphy, Jr.,* special public defender, for the appellant in the first case (defendant Marion).

*Vincent A. Laudone,* special public defender, with whom was *Juri E. Taalman,* for the appellant in the second case (defendant Tetreault).

*Melvin Scott,* special public defender, with whom, on the brief, was *Robert E. Pritchard,* special public defender, for the appellant in the third case (defendant Coman).

*Robert E. Beach, Jr.,* assistant state's attorney, with whom, on the brief, was *Harry S. Gaucher, Jr.,* state's attorney, for the appellee (state).

COTTER, J. After a joint trial to a jury, the defendants were convicted of six counts of breaking and entering in violation of § 53-74 of the General Statutes and one count of larceny in violation of § 53-63 (a). They have appealed from the judgments, claiming, inter alia, that they were denied effective assistance of counsel as a result of their joint representation.[1]

---

[1] Although the defendants were originally represented at an earlier trial by three different attorneys, a mistrial was declared a day after trial had begun when it was learned that one of the state's witnesses was also being represented by the defendant Coman's attorney. Since the defendant Marion's attorney was a member of the same law firm, both attorneys withdrew and a continuance was granted in order to give the defendants the opportunity to procure new counsel. At a pretrial hearing before *Barber, J.,* Marion

The charges involved in the three cases arise from the theft of items from several trailers located at a construction site in Putnam. The state's witnesses testified that on the morning of February 2, 1971, it was discovered that the trailers had been broken into and that an adding machine, typewriter, calculator, copying machine, pump and torches were missing. Although the investigating police officer dusted the scene for fingerprints, none were found. There were no eyewitnesses to the crime, and no physical evidence was found at the scene which would serve to connect the defendants with the break-ins or the larceny. The defendants did not testify.

Crucial to the state's case, therefore, was the testimony of Charles Bates, tending to establish the defendants' involvement in the incident. Bates, a former employee at the Putnam construction site, testified to three incriminating conversations allegedly occurring shortly before and immediately after the time at which the thefts were estimated to have occurred. According to Bates, on February 1, 1971, he drove to the construction site in the company of Marion and Tetreault to pick up tax forms. While driving back to Marion's apartment, one of the two defendants allegedly asked Bates "if they had anything good in the trailers"; and he told

explained that his one attempt to obtain private counsel indicated to him that his financial situation was inadequate to afford the required fee. The special public defender representing the defendant Tetreault was then appointed by the court to represent Marion as well. Coman revealed that he was in similar financial straits but suggested to the court that in a month or so he should be working again and thus possibly be able to retain his own counsel at that time. Stating "I don't think we can wait that long," the court appointed the special public defender representing the defendants Tetreault and Marion to represent Coman also.

them there was a copying machine, some adding machines and typewriters in at least one of the trailers. Later that same day, while all three defendants were present, one of them allegedly asked Bates if they could use his truck to pick up some "stuff" at the construction site. In relating the contents of those two conversations, Bates could not identify the speaker in either instance.

The third conversation to which he testified on direct examination involved an alleged confession to the crime purportedly made by Marion in the early morning of February 2, 1971. According to Bates, Marion explained that they had been to the home of Al Robidoux, a junk dealer, to "get rid of" some items taken from the construction site. Robidoux later testified for the defense that he had bought these items from someone identified only as "Jerry," and generally disassociated himself from the defendants.

It was during this testimony of Bates, the defendants now claim, that a conflict of interest arose and that error was committed in allowing one counsel to continue his representation of the three defendants. The transcript reveals that although the special public defender representing the defendants initially objected to Bates' testimony regarding the first conversation he had with Marion and Tetreault on the grounds that it was inadmissible hearsay, when the state's attorney claimed the question, defense counsel withdrew his objection. No further objections were made by the defendants' attorney throughout the remaining portions of Bates' testimony and, on cross-examination, no attempt was made by defense counsel to exonerate any defendant or to impute the incriminating statements to any

specific defendant. At the close of the presentation of all the evidence, the defendants' counsel made no request to charge and no exceptions were taken to the charge as given by the court.[2]

It is significant to note at this point that the defendants do not necessarily claim they were denied adequate assistance of counsel on the basis of their attorney's inadequate preparation or ineptitude exhibited by representation at trial which was not " 'within the range of competence displayed by lawyers with ordinary training and skill in the criminal law.' Gentry v. Warden, . . . [167 Conn. 639, 646, 356 A.2d 902]." State v. Clark, 170 Conn. 273, 287, 365 A.2d 1167. Rather, they contend that the hearsay testimony of Bates placed defense counsel in an irreconcilable conflict, which virtually compelled him to allow such testimony into evidence

---

[2] The court, in its charge to the jury, made no specific reference to the law applicable to declarations or admissions made by codefendants implicating one another nor was it requested to do so. The following, however, is a portion of the charge apparently relating to the testimony of Bates: "I think at this point I should also state to you our rule as to the so-called admissions of an accused, that is statements claimed to have been made by the accused in the hearing of another person who takes the stand and testifies to what the accused is claimed to have said. In this case some such statements were testified to by witnesses for the State. Now, if you believe this testimony and so find that an accused made such a statement, you are not to give it the same weight as though the accused had himself gotten on the witness stand and made the same statement, but you are to consider it not as the equivalent in value of the direct testimony of the accused but as some evidence circumstantial in its nature of a fact which you may if you find it reasonable and logical so to do, but otherwise should not find to be inconsistent with the present claim of innocence of that accused. That is, as evidence affecting the particular accused making the statement or the admission, if you find that he did make it in the same sense that any other relevant fact which you find to be inconsistent with the claim of an accused is evidence against him."

without objection, since to do otherwise might result in implicating one client whom he represented to the detriment of the others.

Although the representation of codefendants simultaneously by one attorney "is not per se violative of constitutional guarantees of effective assistance of counsel"; *Holloway* v. *Arkansas,* 435 U.S. 475, 482, 98 S. Ct. 1173, 55 L. Ed. 2d 426; *Glasser* v. *United States,* 315 U.S. 60, 77, 62 S. Ct. 457, 86 L. Ed. 680; *United States* v. *Mandell,* 525 F.2d 671, 677 (7th Cir.), cert. denied, 423 U.S. 1049, 96 S. Ct. 774, 46 L. Ed. 2d 637; *United States* v. *Jones,* 436 F.2d 971 (6th Cir.); *Baker* v. *Wainwright,* 422 F.2d 145, 148 (5th Cir.), cert. denied, 399 U.S. 927, 90 S. Ct. 2243, 26 L. Ed. 2d 794; *Watkins* v. *Wilson,* 408 F.2d 351, 352 (9th Cir.); *Fryar* v. *United States,* 404 F.2d 1071, 1073 (10th Cir.), cert. denied, 395 U.S. 964, 89 S. Ct. 2109, 23 L. Ed. 2d 751; *Palmer* v. *Adams,* 162 Conn. 316, 328, 294 A.2d 297; *State* v. *Costa,* 155 Conn. 304, 308, 232 A.2d 913, cert. denied, 389 U.S. 1044, 88 S. Ct. 789, 19 L. Ed. 2d 837; "the 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." *Glasser* v. *United States,* supra, 70. For joint representation to amount to a denial of a defendant's constitutional right to the effective assistance of counsel, however, he must present some factual basis establishing that a conflict of interest actually existed between himself and the other codefendants; see *United States* v. *DeBerry,* 487 F.2d 448, 452 (2d Cir.); *Palmer* v. *Adams,* supra, 328–29; since a claim of conflict cannot be sustained when grounded upon nothing more than mere spec-

ulation and conjecture. *United States* v. *Gallagher*, 437 F.2d 1191, 1194 (7th Cir.); *Palmer* v. *Adams*, supra.[3]

Prior to trial, the defendants' counsel advised the court that he had discussed the possibility of a conflict with the defendants and was aware of none at the time.[4] The court was not alerted to the inculpatory testimony of Bates relative to the oral extrajudicial statements allegedly made by one of the defendants, and no further factual inquiry was

---

[3] In a recent case, one court has taken the position that "[w]hile the potential for prejudice is not so inherent as to require a per se rule of conflict, it is nonetheless sufficiently pervasive, that only a minimal showing of conflict should be required to invoke constitutional protection." *United States* v. *Lawriw*, 568 F.2d 98, 101 (8th Cir.). Appellate courts have differed, however, on how strong a showing of conflict is required before the reviewing court will conclude that a constitutional deprivation has occurred. Compare, for example, *Foxworth* v. *Wainwright*, 516 F.2d 1072, 1077 (5th Cir.) (requiring an actual, significant conflict) with *Lollar* v. *United States*, 376 F.2d 243, 246–47 (D.C. Cir.) (resolving any question as to conflict in favor of the defendant when there are "indications in the record that stir doubts").

[4] The full text of this colloquy is as follows:

"Defense Counsel: And the second matter, Your Honor, is, for the record, I represent three accused. They are aware I have spoken to them, that a conflict of interest may develop. I have talked to them, they have agreed that they will all stand trial together.

The Court: What conflict would there be?

Defense Counsel: There can always be a conflict that I can envision, Your Honor, in the course of any trial where an attorney represents more than one person accused of a crime.

The Court: Well, at the present time you don't see any, is that it?

Defense Counsel: At the present time I don't see any.

The Court: You are aware of no conflict?

Defense Counsel: Pardon me?

The Court: You are aware of no conflict?

Defense Counsel: I am aware of no conflict at this time, Your Honor.

conducted.[5] Ordinarily, a court is obligated to take adequate steps to determine whether the risk of conflict is too remote to require separate counsel if counsel makes representations of a probable risk of a conflict of interests. *Holloway* v. *Arkansas, supra,* 483. Although the right to conflict-free representation may be waived; *United States* v. *Villarreal,* 554 F.2d 235, 236 (5th Cir.); *State* v. *Reed,* 174 Conn. 287, 293, 386 A.2d 243; we will indulge every reasonable presumption against waiver of fundamental constitutional rights. *Craig* v. *United States,* 217 F.2d 355, 359 (6th Cir.). Only when the record clearly discloses that a constitutional right was waived "intelligently, understandingly and in a competent manner" will a claim of waiver be sustained. *State* v. *Beaulieu,* 164 Conn. 620, 630, 325 A.2d 263; *State* v. *Reed, supra.* On the basis of

---

The Court: And you discussed this with the defendants?

Defense Counsel: Yes, I have, Your Honor.

The Court: Have you discussed it with defense counsel?

Mr. Marion: Yes.

Mr. Coman: Yes.

Mr. Tetreault: Yes.

The Court: All indicate that they have. And you are aware of no conflict in this representation he makes of each and all of you, is that correct?

Mr. Marion: Yes.

Mr. Coman: Yes.

Mr. Tetreault: Yes.

The Court: And you are ready for trial?

Defense Counsel: Yes.

State's Attorney: Yes."

[5] Although courts have differed with respect to the scope and nature of the duty of the trial judge to assure compliance with constitutional guarantees of adequate assistance of counsel; see cases cited in *Holloway* v. *Arkansas,* 435 U.S. 475, 483, 98 S. Ct. 1173, 55 L. Ed. 2d 426; we note with approval the rule adopted by the Second Circuit requiring trial judges to make a "careful inquiry" before appointing one attorney to represent two or more defendants. *Morgan* v. *United States,* 396 F.2d 110 (2nd Cir.).

the court's limited inquiry regarding the possibility of a conflict, we cannot conclude that the defendants waived their right to conflict-free representation.[6]

"A conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Foxworth* v. *Wainwright,* 516 F.2d 1072, 1076 (5th Cir.). In the present case, the strategy employed by defense counsel during the testimony of Bates "luminates the cross-purposes under which he was laboring." *Glasser* v. *United States,* 315 U.S. 60, 73, 62 S. Ct. 457, 86 L. Ed. 680. Defense counsel failed to question Bates concerning the absence of Coman when the alleged conversations took place, even though a number of defense witnesses testified later in the trial relative to an alibi defense raised by Coman.[7] Nor was any attempt made by counsel to impute two of the incriminating statements to any particular defendant or request an instruction on this issue.[8] See *United States* v. *DeYoung,* 523 F.2d 807, 809–10 (3rd Cir.). Further, the conflict arising in the joint representation of the

---

[6] The transcript does not indicate that any further inquiry was made by the court concerning the possibility of conflict during the course of the trial.

[7] In fact, during the cross-examination of Bates, counsel for the defendants at no time cross-examined him concerning the incriminating conversations to which he testified on direct examination. Rather, the credibility of Bates was the main subject of cross-examination during which the witness' possible motives for testifying were questioned.

[8] The state argues that these hearsay statements were admissible against all the defendants under either the co-conspirators' exception or as tacit admissions. It is questionable, however, whether there was enough evidence before the court at the time of this testimony sufficient to establish prima facie the existence of a conspiracy as

three defendants becomes evident upon a review of counsel's failure to challenge the out-of-court confession to the crime allegedly made by the defendant Marion on the basis of the principle enunciated in *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476. *Bruton* held that the confrontation clause of the sixth amendment, as applied to the states through the fourteenth amendment, is violated when a codefendant's out-of-court hearsay statement implicating a defendant is admitted into evidence and the defendant is either unavailable at trial or refuses to take the stand and subject himself to cross-examination by the codefendant. *Nelson* v. *O'Neil*, 402 U.S. 622, 626, 91 S. Ct. 1723, 29 L. Ed. 2d 222. An examination of the *Bruton* rule makes it readily apparent that counsel's decision regarding the advisability of having one or more of the defendants testify was not unaffected by his divided loyalties.

Under the circumstances, we conclude it is reasonably probable that the interests of the defendants were inconsistent and that counsel's defense of each defendant was thereby trammeled and restricted in violation of the sixth amendment's mandate requiring effective assistance of counsel. Since "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial"; *Glasser* v. *United States*, supra, 76; and since the record does not

required for the application of the co-conspirators' exception. *Macchio* v. *Breunig*, 125 Conn. 113, 122, 3 A.2d 670; *Cooke* v. *Weed*, 90 Conn. 544, 548, 97 A. 765. Similarly, the circumstances under which the incriminating statements were allegedly made were not sufficiently described so as to render such hearsay testimony admissible under the doctrine of "tacit admissions." See *Obermeier* v. *Nielsen*, 158 Conn. 8, 11–12, 255 A.2d 819.

show that without the testimony of Bates there was clear evidence of the defendants' guilt, new trials are ordered. The potential for conflict of interest in representing multiple defendants is so grave that it ordinarily should not be permitted except in exceptional cases where the court takes adequate steps to determine whether the risk of conflict of interest is too remote to require separate representation and where it is established that the probability of a conflict arising is not reasonably foreseeable.[9]

There is error, the judgments are set aside and new trials are ordered.

In this opinion the other judges concurred.

[9] This is essentially the position taken by the American Bar Association in its Standards Relating to the Prosecution Function and the Defense Function (Approved Draft 1971) § 3.5, p. 211. The commentary following that provision notes that "[a]lthough there may be some situations where it will be mutually advantageous to the defendants to have a single lawyer represent them, the risk of an unforeseen and even unforeseeable conflict of interest developing is so great that a lawyer should decline multiple·representation unless there is no other way in which adequate representation can be provided to the defendants." Id., 214; see also ABA Standards Relating to the Administration of Criminal Justice, p. 123 (1974).