RALPH FESTO ET AL. *v.* BERNARD LUCKART ET AL.
(10857)
(10858)

SPEZIALE, C. J., HEALEY, PARSKEY, SHEA and SPONZO, Js.

Argued October 13—decision released December 27, 1983

*Richard A. Fuchs,* with whom, on the brief, was *Susan E. Weisselberg,* law student intern, for the appellant (named plaintiff).

*Richard L. Albrecht,* with whom, on the brief, was *Stewart I. Edelstein,* for the appellant (plaintiff Clive Russell).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellees (defendants).

PARSKEY, J. On June 29, 1976, a jury convicted the plaintiffs, Ralph Festo and Clive Russell, former police officers in Stamford, of larceny in the first degree and acquitted them of burglary in the third degree. Festo and Russell had been represented by the same attorney at that trial. They were each sentenced to a term of not less than three nor more than six years. Their convictions were affirmed by this court on June 24, 1980. *State* v. *Festo,* 181 Conn. 254, 435 A.2d 38 (1980). They then hired separate counsel and applied for a writ of habeas corpus. The plaintiffs claimed their constitutional right to effective assistance of counsel was denied by their joint representation at trial by a single lawyer, Joseph Mirsky. Russell also contended that Mirsky's representation was ineffective because he failed to claim a violation of Russell's fourth amendment rights in the appeal. The petition was denied and the trial judge, *Cioffi, J.,* certified the case for appeal to this court.

The detailed facts of this case are set out in *State* v. *Festo,* supra. The facts relevant to the consideration of this appeal are as follows: On June 16, 1975, a neighbor of Frederick Gibbs called the police to investigate a possible burglary of the Gibbs' Stamford home. Earlier in the month, on June 8, the police had discovered that the Gibbs' home had been burglarized.

This time, in the Gibbs' driveway, the police found a truck, its hood still warm, which was registered to William Caputo of Stamford. Inside the truck were, among other things, a pair of police trousers with Ralph Festo's name inside and a handbag containing some personal papers of Festo's wife.

On June 8, 1975, Russell and Caputo rented a space at an antique show in Westchester, New York, where they exhibited a bureau later identified as belonging to Gibbs. On June 12, Caputo offered to sell furniture to United Housewrecking Corporation, which buys and sells used furniture. When a buyer for United Housewrecking, Ralph Sparan, called Caputo the next day to arrange for a viewing, Russell answered the phone and directed the buyer to Caputo's home. There, Russell showed him some furniture, later identified as belonging to Gibbs, and told him it belonged to a woman whom Russell knew. Sparan requested that his employer have an opportunity to view the furniture and Russell subsequently displayed the furniture to him. At this meeting, Russell stated that the furniture belonged to his grandmother. Russell sold the furniture for $1500. When Sparan arrived later that day to pick up the furniture, both Russell and Festo were present. Russell signed a receipt for the furniture and Sparan issued Russell a check for $1500, which Russell endorsed. The check was presented to a bank for payment by Festo that afternoon.

On June 28, 1975, Caputo, accompanied by his lawyer, made a statement to the Stamford police. Later that day, Festo and Russell offered their written resignations, badges, guns, keys and other equipment. In a conversation with Lieutenant Considine, at which Caputo, Festo and Russell were present, either Russell or Festo stated that they thought the house was abandoned, that this was the only incident in which they

had been involved, that it was an embarrassing situation and that they hoped other members of the department would not suffer because of it. At trial, Considine could not recall which officer made the statements. He did recall that when he asked the whereabouts of Gibbs' metric tools, it was Russell who answered, "[d]on't press me on it. I can't get them." Festo and Russell were arrested on July 19, 1975.

Approximately three weeks prior to their arrest, the plaintiffs, upon Russell's recommendation, met with and hired Attorney Joseph Mirsky. The plaintiffs agreed that they would share Mirsky's fee. On July 24, 1975, Mirsky filed his appearance on behalf of both men. The next day, both men pleaded not guilty. Their joint trial began on May 26, 1976.

At trial, the state attempted to introduce into evidence a diary, clipboard and stenographic pad seized from Russell's locker at police headquarters. Several incriminating entries were contained in these documents, including those for May 14 and 30, 1975, which noted Gibbs' name, address and license plate numbers and one for June 8, 1975, which referred to an auction in White Plains, New York. Mirsky objected, claiming surprise, since these items had not been included in the state's reply to the plaintiffs' August, 1975 motions for production and discovery. He also objected on fourth amendment grounds. The state explained that, two days after Russell had resigned and surrendered the key to his locker, a police lieutenant used the key to open the locker. He placed the contents in a cardboard box which remained under lock and key until almost a year later. On May 5, 1976, the police lieutenant who had custody of the box directed a detective to obtain a handwriting sample from one of the documents in it, and the incriminating entries were found. Hence, the

state was unaware of this evidence until just before trial. Mirsky moved to suppress the evidence and to declare a mistrial.

At a lengthy hearing on this matter, Mirsky made an oral motion to sever, on the ground that the evidence might be very prejudicial to Festo. It appears that this motion was never acted on. The motions for suppression and mistrial were denied. When the evidence was admitted, Mirsky did not object or request an instruction to limit the evidence to Russell. Also at trial, Festo presented an alibi defense to the June 8 burglary, while Russell presented none.

After their conviction, Attorney Charles Hanken, an associate of Mirsky, took over their appeals. Included in the preliminary statement of issues, which Hanken prepared and Mirsky signed, was a fourth amendment challenge to the search of the locker and seizure of its contents. This issue was not included in the briefs to this court in the first appeal and thus, the issue was not considered. *State* v. *Festo,* supra, 262 n.3.

In this appeal, the plaintiffs claim error in the habeas court's holding that their right to effective assistance of counsel, as provided by the sixth and fourteenth amendments to the federal constitution, and article first, § 8, of the Connecticut constitution, was not violated by the trial court's failure to inquire into the possibility of a conflict of interest arising out of their joint representation, and that there was no actual conflict in their defense. Russell further claims that the habeas court erred in holding that the failure to press the fourth amendment claim did not constitute ineffective assistance of counsel.

I

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correla-

tive right to representation that is free from conflicts of interest." *Wood* v. *Georgia,* 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). The plaintiffs assert that, in order to protect that right, in every case of multiple representation the trial court has an affirmative duty to inquire about the possibility of conflict among the defendants. The plaintiffs point to *State* v. *Marion,* 175 Conn. 211, 221, 397 A.2d 533 (1978), as mandating this inquiry. The plaintiffs are incorrect in their interpretation of our holding in *Marion.*

In that case we noted that "[t]he potential for conflict of interest in representing multiple defendants is so grave that it ordinarily should not be permitted except in exceptional cases where the court takes adequate steps to determine whether the risk of conflict of interest is too remote to require separate representation and where it is established that the probability of a conflict arising is not reasonably foreseeable." Id., 221. Although admittedly this language may be read broadly, it must be viewed in context. In *Marion* the court appointed one lawyer to represent three defendants. In that situation, this court imposed an affirmative duty of inquiry on the trial court.[1]

The plaintiffs assert that *Marion* should be read in light of the United States Supreme Court's more recent stated preference for a rule mandating an affirmative duty to inquire in all cases of multiple representation.

[1] That *Marion* required nothing more is made clear in footnote 5 on page 218: "Although courts have differed with respect to the scope and nature of the duty of the trial judge to assure compliance with constitutional guarantees of adequate assistance of counsel; see cases cited in *Holloway* v. *Arkansas,* 435 U.S. 475, 483, 98 S. Ct. 1173, 55 L. Ed. 2d 426 [1978]; we note with approval the rule adopted by the Second Circuit requiring trial judges to make a 'careful inquiry' before *appointing* one attorney to represent two or more defendants. *Morgan* v. *United States,* 396 F.2d 110 (2nd Cir. [1968])." (Emphasis added.) *State* v. *Marion,* 175 Conn. 211, 218 n.5, 397 A.2d 533 (1978).

*Cuyler* v. *Sullivan,* 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). Though the *Cuyler* court did deem such a practice "desirable"; id., 346 n.10; its holding was that it cannot, as a matter of constitutional law, impose such a rule on state courts. Id., 346. Constitutionally, an inquiry is only required whenever a "court knows or reasonably should know that a particular conflict exists." Id., 347.

Though we are aware that some states require an inquiry in every case; see, e.g., *People* v. *Lloyd,* 51 N.Y.2d 107, 412 N.E.2d 371 (1980); *State* v. *Bellucci,* 81 N.J. 531, 410 A.2d 666 (1980); and that since 1980 it is the rule in the federal system; Fed. R. Crim. Proc. 44 (c); we decline to follow suit. We believe that such a per se rule is problematic. To be meaningful, an inquiry must be thorough and searching. See, e.g., *United States* v. *Flanagan,* 527 F. Sup. 902 (E.D. Pa. 1981). Yet such scrutiny can be overly intrusive into the attorney-client relationship and areas, such as strategy, from which the trial judge should be insulated. On the other hand, merely to ascertain whether the defendants were apprised of the inherent risks of joint representation—an obligation which the attorney bears independently, under the Code of Professional Responsibility, DR 5-105 (C)—is meaningless. Moreover, this may present a trap for the defendant, for on the basis of this perfunctory inquiry a defendant may be held to have waived a later conflict of interest claim. See, e.g., *People* v. *Lloyd,* supra.[2]

---

[2] *People* v. *Lloyd,* 51 N.Y.2d 107, 412 N.E.2d 371 (1980), is illustrative of this dilemma. In that case the trial court, in fulfilling its affirmative obligation, informed the defendants and their sole lawyer that the possibility of conflict could arise from the fact that one of the defendants arrived at the scene of the crime later. The defendants acknowledged this and indicated their preference for the joint representation. Their attorney stated that he had informed the defendants of a possibility for conflict. Id., 111. On appeal one defendant claimed that this pretrial inquiry was insufficient in that the court should have explained in more detail the potential con-

Thus we believe that our present rule—that the court must explore the possibility of conflict when it appoints a single attorney to represent multiple defendants and, in other cases, when it knows or reasonably should know of a conflict—more than adequately safeguards the defendant's constitutional rights. With that in mind, we consider whether an inquiry was required in this case.

The plaintiffs point to the following facts as necessitating an inquiry: (1) the evidence in the truck implicated Festo only; (2) the evidence from the locker implicated Russell only; (3) the motion for a mistrial based on surprise pertained to evidence detrimental to Russell only; (4) during the suppression hearing, Mirsky stated that the locker evidence, if admitted, would be prejudicial to Festo and on that basis, moved for severance; (5) Festo presented an alibi defense, while Russell did not; (6) Mirsky did not object to Considine's testimony about the admission of Festo and/or Russell,[3] nor did he press Considine on cross-examination about his failure to attribute the statements to a specific person.

---

flict. The majority of four held this minimal colloquy to be sufficient, stating: "First, prior to trial, when the inquiry should be made, the court may not be fully aware of the evidence, the nature of the defendants' case or its ramifications. Secondly, and more important, to require the defendant or his attorney to disclose to the court details of the defense, defense conferences, or strategy would in itself invade the defendants' rights, including the right to counsel." (Citations omitted.) Id.

The three dissenting judges criticized the majority for allowing the trial court to rely on the attorney's representation that the issue of conflict had been adequately discussed rather than requiring a more thorough and independent exploration.

[3] The fact that Mirsky did not object to Considine's testimony is irrelevant to our holding that the trial judge should have known of a possible conflict and initiated an inquiry. As will be discussed later, since this testimony was admissible as an admission by both plaintiffs, such an objection would have been futile.

In reviewing these claims, we recognize that "the perspective of the living trial is lost in the search for error in a dead record." *Glasser* v. *United States,* 315 U.S. 60, 88, 62 S. Ct. 457, 86 L. Ed. 680 (1942) (Frankfurter, J., dissenting). Nevertheless, although none of these claims alone was sufficient to alert the trial judge to a possible conflict, we find that their cumulative effect was to suggest a potential conflict. As such, the trial judge should have known of a possible conflict and initiated an inquiry.

This, however, does not dispose of the case. It is true that there is language in *Wood* v. *Georgia,* 450 U.S. 261, 272 n.18, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981), which appears to require reversal when the trial court fails to make the necessary inquiry. But the court in *Wood,* having found enough in the record to have warranted an inquiry into a possible conflict, remanded for a hearing to determine if there had been an actual conflict. Id., 273. Hence, *Wood* can only be construed as requiring reversal when actual conflict is found. *Brien* v. *United States,* 695 F.2d 10, 15 n.10 (1st Cir. 1982). This is further buttressed by footnote 21 in *Wood* which reads: "Because we are presented here only with the question of petitioners' probation revocations, we do not order more sweeping relief, such as vacating petitioners' sentences or reversing their convictions. Such actions do, however, remain within the discretion of the trial court upon appropriate motion.

"There also is the possibility that this relief may be available in habeas corpus proceedings, if petitioners can show an actual conflict of interest during the trials or at the time of sentencing." *Wood* v. *Georgia,* supra, 274 n.21. Since the plaintiffs' habeas petitions resulted in the required hearing, we need only review whether the habeas court erred in finding that there was no actual conflict.

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler* v. *Sullivan,* supra, 348. In *State* v. *Marion,* 175 Conn. 211, 219, 397 A.2d 533 (1978), we defined a conflict of interest as when " 'one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing.' *Foxworth* v. *Wainwright,* 516 F.2d 1072, 1076 (5th Cir. [1975])." We hold that the plaintiffs have failed to prove such a conflict.

A

As proof of an actual conflict which adversely affected his representation, Russell points to the following facts: (1) the evidence from Caputo's truck implicated Festo but was admitted without a limiting instruction; (2) Mirsky did not object to Considine's testimony about Festo's and/or Russell's admission nor press him on cross-examination about his failure to attribute the statements to a specific defendant; (3) Mirsky was obligated to present Festo's alibi defense, highlighting that Russell had none; (4) Festo cashed the check for the furniture sale.[4]

Nothing in the truck evidence connected Russell with that truck. The import of that evidence was to inculpate Festo in the burglary, of which he was acquitted. Even if the jury utilized this evidence in convicting Festo of the larceny, we fail to see how, even absent

---

[4] Both plaintiffs point to an encounter with Mirsky's associate, Joseph Belinkie, who allegedly told each of them to structure their testimony so as not to incriminate the other. At the habeas corpus hearing, Belinkie posed an entirely different version of this conversation. The plaintiffs are asking us to accept their version of the facts, which we cannot do. *Kalleher* v. *Orr,* 183 Conn. 125, 128, 438 A.2d 843 (1981).

a limiting instruction, it was imputed to Russell. Separate counsel for Russell could only have established what the record already showed—that these items had nothing to do with Russell.

In contrast, it is clear that Considine's testimony concerning his conversation with Russell and Festo was damaging to both plaintiffs. The fact that this testimony was not objected to or that it was not subjected to intensive cross-examination does not give rise to a conflict, however. An objection on behalf of either plaintiff would not have kept this testimony out of evidence, since it was admissible as an admission by one and an admission by silence against the other. *State* v. *Ferrone,* 97 Conn. 258, 265–66, 116 A. 336 (1922); 3 Wharton, Criminal Evidence (Torcia 13th Ed.) § 700. Considine's testimony on direct of the plaintiffs' statements refers to "they."[5] Surely if one of the plaintiffs had disassociated himself from these statements, Considine's testimony would have been otherwise. Such an admission by one cries out for denial by the other. In

---

[5] "Q. During this period of time did you have any discussion with either Mr. Festo or Mr. Russell?

"A. Yes, sir, I did. . . .

"Q. What was the discussion?

"A. Well, there was general discussion and concern that it was an embarrassing situation. That was the only item. That this was the only incident that they had been involved with, and that they hoped that the other members of the department would not suffer because of it.

"Q. Was there any statement relative to the status of the Gibbs house?

"A. Yes, there was.

"Q. What was that?

"A. They thought that the house had been abandoned. . . .

"Q. When you referred to 'they,' you referred to both Mr. Russell and Mr. Festo?

"A. Yes. And also Mr. Caputo was present.

"Q. Was he a party to these statements you have just made?

"A. Not this particular conversation. Things I said there.

"Q. Are you able to say with any specificity whether Mr. Russell said anything up to this point, said a certain thing, or Mr. Festo said a certain thing?

the absence of such a denial, it is admissible as an admission against both.[6] Having separate counsel would not have precluded this.

Nor would separate counsel have diminished the impact of Festo's alibi defense on Russell's guilt. Festo presented an alibi for the June 8 burglary. Since both plaintiffs were acquitted of burglary, we do not see how this evidence absolved Festo at Russell's expense.

Similarly, we do not believe that Russell was adversely affected by the evidence that Festo cashed the check received from United Housewrecking. This evidence strongly implicated Festo in the larceny, but we fail to see how it implicated Russell. The evidence against Russell was substantial—he participated in the auction where Gibbs' furniture was sold, he negotiated the sale of some of Gibbs' other furniture and represented that it belonged to a woman he knew, he received and endorsed the check from this sale, he (or Festo) admitted his involvement to Considine, when queried about Gibbs' stolen tools he answered, "[d]on't press me on it. I can't get them," and Gibbs' name and car license plate number appeared in his stenographic pad. In the face of these facts, we are unconvinced that the evidence pertaining to Festo bore on Russell's conviction of larceny.

---

"A. No, sir, I am not.

"Q. Are you ready to say during the period of conversation, at least, one of them said one of these things?

"A. Yes.

"Q. In other words, they both spoke to you. But you can't be certain which one said which?

"A. Yes, sir."

[6] At oral argument counsel for Festo submitted that this testimony was inadmissible as an admission because the plaintiffs were in custody and hence the right to remain silent attached. See State v. Ferrone, 97 Conn. 258, 116 A. 336 (1922); 3 Wharton, Criminal Evidence (Torcia 13th Ed.) § 703. There is no evidence that the plaintiffs were in custody at this time. Moreover,

## B

Festo offers the following facts to show an actual conflict pertaining to him: (1) the evidence seized from the locker implicated Russell only but was admitted without a limiting instruction; (2) though Festo was present at the sale of the furniture to United Housewrecking, Russell conducted all the negotiations and hence a plausible defense of innocent bystander existed for Festo.[7]

Nothing in the locker evidence referred to Festo or connected him to the burglary or larceny. As with the truck evidence, separate counsel would only have reiterated what the record already established.

In order for Festo to prevail on his last claim, he must show that the alternative defense that Mirsky forsook was plausible. *Foxworth* v. *Wainwright,* 516 F.2d 1072, 1080 (5th Cir. 1975). The evidence that Festo was present at the sale of stolen furniture to United Housewrecking and then cashed the check from this sale coupled with Considine's testimony of the admission is incompatible with a claim of innocent bystander to a larceny. Since separate counsel could not have kept this evidence out of the trial, we do not view this alternative defense as plausible. See *Smith* v. *Regan,* 583 F.2d 72, 76 (2d Cir. 1978).

## C

We believe that the plaintiffs are engaging in "nothing more than hindsight rationalization." *Parker* v. *Parratt,* 662 F.2d 479, 484 (8th Cir. 1981). Their agreed upon defense strategy, according to Mirsky, was not

---

it is Considine's uncontradicted testimony that during this discussion he was not taking a statement from them or conducting an interrogation.

[7] Festo makes the same claim with respect to Considine's testimony. Our previous discussion of this disposes of Festo's contention that this testimony presented a conflict in his representation.

only that they were innocent, but that Caputo, the missing witness,[8] engineered the whole scheme. Indeed, their acquittal of the burglary reveals that this strategy was partially successful.

Both plaintiffs cite numerous cases finding an actual conflict and claim that they are dispositive of this case. A reading of these cases reveals that their facts and circumstances differ from the case at bar.

## II

Lastly, we turn to Russell's claim that he was denied effective assistance of counsel by Mirsky's failure on appeal to press a fourth amendment challenge to the introduction of the locker evidence. Russell argues that Mirsky assured him that this specific ground would be presented and hence, the unilateral abandonment of the claim violated his constitutional right to effective assistance of counsel. Since we are presented with a factual claim only, we express no opinion on this constitutional argument.

After listening to the testimony of Russell, Festo, Mirsky and his associate Hanken on this matter, the habeas court concluded that "there is NO credible testimony that Attorney Mirsky assured Russell that he would assert Fourth Amendment grounds re this issue on appeal" and "there was a lack of any discussion between Russell and his attorney concerning the specific grounds of appeal re this issue."[9] Russell's brief is an attack on these findings. After reviewing the transcripts of the habeas hearing; *Ruscito* v. *F-Dyne Electronics Co.,* 177 Conn. 149, 162, 411 A.2d 1371 (1979); we cannot say that those findings are clearly erroneous.

---

[8] Prior to the trial, Caputo fled the state.

[9] The introduction of the locker evidence was appealed on other grounds. *State* v. *Festo,* 181 Conn. 254, 435 A.2d 38 (1980).

Practice Book § 3060D; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 435 A.2d 24 (1980).

The merits of Russell's fourth amendment claim might conceivably be raised in a further habeas proceeding based on the failure of his counsel to pursue this as a ground for appeal. Though we do not decide the fourth amendment issue here, we note that an attorney need not press every claim on appeal. *Jones* v. *Barnes,* 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). If Hanken had raised this claim, it would probably have been countered by the argument the state proffers here, that the property was abandoned. The evidence was that Russell turned over his key and never made any claim to the property. In light of this evidence it was certainly reasonable for Hanken to decide not to diminish his strong points by including a weak one. See *Favorite* v. *Miller,* 176 Conn. 310, 313, 407 A.2d 974 (1978).

There is no error.

In this opinion the other judges concurred.