JOHN M. PHILLIPS *v.* WARDEN, STATE PRISON (7762)

O'CONNELL, FOTI and CRETELLA, Js.

Argued May 11—decision released August 28, 1990

*Timothy H. Everett* and *Giovanna Tiberii,* certified legal intern, with whom, on the brief, were *Michael R. Sheldon* and *Todd D. Fernow,* for the appellant (petitioner).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *John Connelly,* state's attorney, and *Patricia King,* former deputy assistant state's attorney, for the appellee (respondent).

FOTI, J. This is an appeal[1] from a decision of the trial court denying the petitioner's application for a writ of habeas corpus and rendering judgment for the respondent. The application challenges the validity of the petitioner's conviction, after a jury trial, of sexual assault in the first degree, unlawful restraint in the first degree and burglary in the first degree. The petitioner claims on appeal that the habeas court improperly concluded (1) that the petitioner was not denied the effective

---

[1] The trial court granted the petitioner's request for certification of the questions involved in this decision in accord with General Statutes § 52-470 (b).

assistance of counsel at his trial due to a conflict of interest, and (2) that the trial court's failure to inquire into defense counsel's possible conflict of interest did not warrant the issuance of the writ of habeas corpus.[2] We affirm the judgment of the habeas court finding that the petitioner did not meet his burden of proof on these claims.

On May 13, 1983, the court sentenced the petitioner to concurrent terms of incarceration of eighteen years for sexual assault in the first degree and five years for unlawful restraint in the first degree, and to a consecutive term of twelve years for burglary in the first degree. The petitioner's total effective sentence is thirty years.

The genesis of the petitioner's claim of ineffective assistance of counsel lies in the murder conviction of his attorney, Bernard Avcollie. Avcollie had been a prominent attorney and a well known politician in the greater Waterbury area for many years prior to his conviction for the murder of his wife in 1977. Avcollie's trial took place in the judicial district of Waterbury. When his conviction was set aside by the trial judge, the state appealed. The conviction was later reinstated by our Supreme Court in *State* v. *Avcollie,* 178 Conn. 450, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980). After denial of certiorari by the United States Supreme Court, the trial court sentenced Avcollie, on March 14, 1980, to an indefinite term of eighteen years to life imprisonment. Avcollie's judgment of conviction was affirmed by our Supreme Court on December 14, 1982, in *State* v. *Avcollie,* 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983).

---

[2] The petitioner claims ineffective assistance of counsel in violation of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.

Avcollie's legal battle was the source of numerous headlines in the Waterbury and Naugatuck newspapers between 1975 and 1983. These publications have wide circulation in the Waterbury judicial district from which jurors for the petitioner's trial were chosen. The case against Avcollie was prosecuted by the Waterbury state's attorney's office, as was the case against the petitioner.

After Avcollie's sentence was imposed, his counsel reached an agreement with the Waterbury bar grievance committee that permitted him to continue to practice law until his direct appeals were exhausted. The grievance committee then filed a motion to have its report on Avcollie made public in order to protect clients, both current and potential. The rules of practice did not provide for temporary suspensions at that time, and the state's attorney's office would not release the information the grievance committee needed to proceed against Avcollie. The court, *Henebry, J.,* signed the order making the report public.

As a result of the notoriety surrounding his murder case, Avcollie's once flourishing law practice rapidly diminished and he took cases that he once would have refused, including a certain sexual misconduct matter that was resolved by way of accelerated rehabilitation. That case led to referrals of other sex cases. The petitioner in the present case was arrested and held in custody on September 11, 1982. A friend of his secured an associate of Avcollie's to represent him at the arraignment. The associate introduced the petitioner to Avcollie at the courthouse on the day of arraignment and suggested that the petitioner hire Avcollie to represent him in the matter. At that first meeting, Avcollie did not tell the petitioner anything about his legal problems. The petitioner did not move to Connecticut until 1978. He was not aware of Avcollie's notoriety. Avcollie

agreed to represent him because he was willing to pay a $2000 retainer fee and because Avcollie did not believe the case would go to trial. At that time, the petitioner made Avcollie aware that he intended to present an alibi defense.

Three days after the petitioner's arraignment, he was released on bail. It was then that he learned of Avcollie's personal legal situation. His friend informed him that Avcollie had been tried and convicted for the murder of his wife, that the conviction had been overturned by the trial judge, and that the state was appealing. The petitioner on the recommendation of friends and relatives, decided to retain Avcollie. He met with Avcollie again about ten days later at Avcollie's office and paid the $2000 retainer. At that meeting, Avcollie opened a file for his client. Avcollie took two pages of notes concerning the petitioner's background, his job, the criminal charges filed against him, his alibi and a list of the state's witnesses. About a month later, they met for a third time. At that time, Avcollie informed the petitioner that, because the case would probably go to trial, there would be additional fees. Avcollie did not disclose his own legal problems at any of those meetings.

Sometime after January 20, 1983, the pair met in Avcollie's office again. At that meeting, the petitioner was told that he would have to pay for Avcollie's court time once the case went to trial. For the first time, Avcollie briefly mentioned his own legal situation. He informed the petitioner that the Connecticut Supreme Court had affirmed his murder conviction, and that he was concerned that his own legal problems could affect the jury's attitude toward the petitioner. He went into no further detail at that point. Avcollie had a twofold purpose in calling that meeting. First, he wanted the petitioner to know the status of Avcollie's criminal con-

viction. Second, Avcollie wanted to assure himself that his continued representation of the petitioner would be on a "cash and carry basis." When Avcollie assured the petitioner that he felt he could do a credible job despite his legal problems, the petitioner indicated that he wanted their attorney-client relationship to continue. That agreement was never reduced to writing.

During the general voir dire, Avcollie told the panel of potential jurors: "If you know anything about any of the people I have mentioned that work in my office or particularly about me, if there is anything that you know or feel about me that will inhibit your ability to judge this man fairly, then you should so indicate. You are not, of course, sitting in judgment of his attorney nor of his office staff any more than you are sitting in judgment of the state's attorney's office, you're in judgment of the defendant."

Even though Avcollie believed that most members of the jury panel knew of his conviction, he declined to ask the panelists during individual voir dire whether they were aware of his criminal conviction or whether any juror knew him from his participation in politics or local affairs.

The habeas court, in a thorough and well reasoned fifty-five page memorandum of decision, concluded that there was no actual conflict of interest and denied the petition. We agree with the judgment of the habeas court and affirm.

I

The petitioner first claims that the habeas court improperly concluded that there was no conflict of interest between the petitioner and Avcollie. Closely tied to this claim are his assertions that the court improperly defined the term conflict of interest, and

that it misapplied the test enunciated in *Cuyler* v. *Sullivan,* 446 U.S. 335, 349, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).[3]

"Our state and federal constitutions guarantee a criminal defendant the right to assistance of counsel. U.S. Const., amend. VI; Conn. Const., art. 1, § 8. As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest." *State* v. *Williams,* 203 Conn. 159, 166–67, 523 A.2d 1284 (1987). That right to conflict free representation applies also to matters where a conflict of interest may impair an attorney's ability to represent his client effectively. Id.

A defendant's sixth amendment right to conflict free counsel is constitutionally distinct from that defendant's right to a competent attorney. *State* v. *Marion,* 175 Conn. 211, 215–16, 397 A.2d 533 (1978). It must also be noted that an attorney may not accept employment if the exercise of his professional judgment on behalf of his client will be, or may reasonably be, affected by his own personal interests. Rules of Professional Conduct, Rule 1.7; Code of Professional Responsibility, DR 5-101.

## A

### CONFLICT OF INTEREST

A conflict of interest has been determined to be present where one party in interest stands to gain significantly by adducing evidence, advancing arguments or engaging in conduct that is detrimental to the interests of another party. See *Festo* v. *Luckart,* 191 Conn. 622, 631, 469 A.2d 1181 (1983); *State* v. *Marion,* supra,

---

[3] Because the first step of the *Cuyler* analysis requires that an actual conflict of interest be found, we need not review this claim further in light of our conclusion that the habeas court properly found that there was no conflict of interest between the petitioner and Avcollie.

219. " 'In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' *Cuyler* v. *Sullivan,* [supra, 348]." *State* v. *Rodriquez,* 200 Conn. 685, 696, 513 A.2d 71 (1986); *Festo* v. *Luckart,* supra. Once an actual conflict is demonstrated, prejudice will be presumed. *Strickland* v. *Washington,* 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Thus, the standard is that the petitioner must first demonstrate an actual conflict of interest, and then that the conflict adversely affected the attorney's performance. Once the petitioner establishes an actual conflict, he need not prove prejudice, but simply a lapse in representation resulting from the conflict. *United States* v. *Iorizzo,* 786 F.2d 52, 58 (2d. Cir., 1986).

As proof of an actual conflict, the petitioner in the present case asserts (1) that Avcollie failed to advocate the petitioner's best interest when he defended the petitioner in the same courthouse and against the same prosecutor's office that had pursued Avcollie's own criminal conviction, (2) that Avcollie jeopardized the petitioner's constitutional right to a fair trial before an impartial jury when he failed to voir dire prospective jurors individually in order to ferret out the extent of their knowledge of Avcollie's own case and any bias that may have resulted from this knowledge, and (3) that Avcollie took the petitioner's case only because he needed the fee.

We agree with the habeas court's findings that there was no conflict of interest between the petitioner and Avcollie.[4] To the contrary, their interests converged at all times to achieve the ultimate goal of acquittal,

---

[4] The court found "[a]s a matter of fact, the interest of Avcollie and that of the petitioner at all times did not conflict or diverge but rather they converged in that each wanted to obtain a not guilty verdict."

and have not been shown to have diverged at any point. Avcollie apprised the petitioner of the inherent risks of his representation as required under the Code of Professional Responsibility, DR 5-105 (C), and the petitioner chose, nevertheless, to continue their attorney-client relationship.

The petitioner's bald assertions as to the situs of the trial do not substantiate his claim of conflict of interest. Avcollie was in an adversarial relationship with the Waterbury prosecutor's office in both cases. The petitioner makes no claim that Avcollie compromised the petitioner's defense either to advance Avcollie's own defense, or in an attempt to gain, in any other way, at the petitioner's expense.

Similarly, the petitioner's claim that Avcollie should have voir dired the jurors individually to discover the extent of their knowledge of Avcollie's conviction is also unfounded. Had Avcollie done as the petitioner now suggests, this tactic could have served to ensure a biased jury rather than to dispel any potential bias or prejudice in that it would have made them aware of the details of Avcollie's personal legal dilemma. Avcollie may well have made a strategic, reasonable and deliberate choice to protect the interests of the petitioner by not planting the seeds of prejudice where none existed.[5]

Finally, we cannot conclude that it is a conflict of interest for an attorney to accept a case because he is

---

[5] The court stated that "[i]n this case there was no evidence presented that any of the jurors sitting on the petitioner's case harbored any hostility toward Attorney Avcollie that would prevent such juror from judging the case fairly and impartially." The court applied the actual bias test of *State* v. *Marra,* 195 Conn. 421, 433, 489 A.2d 350 (1985). *Marra* required a showing of actual bias where the court denied two challenges for cause after a complete voir dire. We agree that here, without having conducted a line of questioning during individual voir dire to ferret out potential bias, it is impossible now to prove actual bias.

in need of the fee. A fee is generally defined to be a remuneration for the services of a professional person, such as a lawyer or a physician. See Ballentine's Law Dictionary, 3d Ed. Clearly, there is no conflict or divergence of interests present when a client pays an attorney an agreed upon fee in exchange for professional legal advice and counsel.

The habeas court meticulously considered the petitioner's claim that an actual conflict of interest existed. The issue of credibility and the weight to be given the evidence presented is within the province of the trier of facts and we cannot retry the case; *State* v. *Reddick,* 207 Conn. 323, 328, 541 A.2d 1209 (1988); nor can we substitute our judgment for that of the trier of fact. *State* v. *Almeda,* 211 Conn. 441, 450, 560 A.2d 389 (1989). In light of the record before us and the substantial findings of fact rendered by the habeas court, we conclude that there was no conflict of interest between the petitioner and Avcollie.

B

HABEAS COURT'S DEFINITION OF CONFLICT
OF INTEREST

The petitioner also claims that the habeas court improperly used the phrase "cause of action" rather than "course of action"[6] when defining the term conflict of interest in its memorandum of decision. The petitioner asserts that the court's nearly consistent reliance

[6] In all but one instance the habeas court in its memorandum of decision misstated Justice Marshall's definition of a conflict of interest as follows: "There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue *or to a cause of action.*" (Emphasis added.) In Justice Marshall's definition, as found in *Cuyler* v. *Sullivan,* 446 U.S. 335, 356 n.3, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), the italicized phrase reads *"or to a course of action."*

on the wrong phrase lead it to look for a divergence of interest only as to the petitioner's and Avcollie's ultimate goal. He contends that while both may have had the same ultimate goal of the petitioner's acquittal, Avcollie's means of achieving this goal placed his *course* of action in conflict with the petitioner's best interest.

Even if we were to assume, arguendo, that the word "cause" was neither a misspelling nor a typographical error, and that the court intended to say exactly what it did say, we cannot conclude that this phrasing, in any way, affected the court's conclusion that no actual conflict was ever demonstrated. In light of our conclusion above that the interests of the petitioner and Avcollie did not diverge at any point during the proceedings, any misconception by the habeas court on this point remains irrelevant. Because the habeas court found, and we agree, that the interests and goals of Avcollie and the petitioner were parallel at all times, there was no conflict of interest as to the *course* or *cause* of action.

## II

The petitioner next claims that he is entitled to a new trial because the trial court violated the sixth amendment duty to inquire into Avcollie's conflict of interest.

"A trial court has the obligation to inquire into the possibility of a conflict of interest 'when it knows or reasonably should know' that a potential conflict exists. *State* v. *Martin,* [201 Conn. 74, 79, 513 A.2d 116 (1986)]; *State* v. *Rodriquez,* 200 Conn. 685, 695, 513 A.2d 71 (1986); *Festo* v. *Luckart,* supra, 629." *State* v. *Williams,* 203 Conn. 159, 168, 523 A.2d 1284 (1987).

The habeas court concluded "that although none of the claims above was sufficient to alert the trial court to a possible conflict, their cumulative effect suggested a potential conflict. As such, the trial court should have

known of a possible conflict and initiated an inquiry." The court, however, held that a reversal of the conviction was not required since it had found no actual conflict of interest under the facts of the case.

The respondent argues alternatively (1) that the habeas court improperly held that the trial court had a duty to initiate an inquiry into Avcollie's potential conflict of interest, (2) that the habeas is not warranted because the court found no actual conflict was demonstrated by the petitioner, or (3) that the petitioner's awareness of Avcollie's legal problems constituted a waiver of his right to conflict free counsel. The petitioner maintains that he is entitled to a reversal of his conviction because the respondent cannot show that the court's failure to conduct an inquiry was harmless beyond a reasonable doubt.

The habeas court in determining that an automatic reversal is not mandated under the facts of this case also found that as of the date of the petitioner's trial Avcollie was fully licensed to practice law in the state of Connecticut and that neither he nor the petitioner, nor the state's attorney brought to the attention of the trial court the possibility of a conflict of interest arising from Avcollie's representation.

Relying on the holding of *Wood* v. *Georgia,* 450 U.S. 261, 272 n.18, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981), our Supreme Court has held that a petitioner's conviction shall be reversed only when an actual conflict of interest has been found. *Festo* v. *Luckart,* supra, 630–31. Because the petitioner's habeas petition resulted in the required hearing, "we need only review whether the habeas court erred in finding that there was no actual conflict." Id., 630.

In accord with *Festo,* we conclude that even if the trial court should have known of Avcollie's potential

conflict, its failure to conduct an inquiry into the same could have been found harmless beyond a reasonable doubt because the record clearly shows that there was no actual conflict of interest. The lack of an actual conflict precluded habeas relief under the facts of this case.

The judgment is affirmed.

In this opinion the other judges concurred.