STATE OF CONNECTICUT *v.* JOE BURGOS VEGA
(SC 16391)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 23, 2001—officially released February 12, 2002

*Conrad Ost Seifert*, for the appellant (defendant).

*Richard F. Jacobson*, special assistant state's attorney, with whom was *Cornelius P. Kelly*, assistant state's attorney, for the appellee (state).

*William B. Westcott* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*G. Douglas Nash*, chief of legal services, and *Gerard A. Smyth*, chief public defender, filed a brief for the office of the chief public defender as amicus curiae.

*Opinion*

NORCOTT, J. The defendant, Joe Burgos Vega, appeals from the judgment of conviction, rendered after a jury trial, of two counts of assault in the first degree

in violation of General Statutes § 53a-59[1] and one count of kidnapping in the second degree in violation of General Statutes § 53a-94.[2] He was sentenced to a total effective term of sixty years and appealed his conviction to the Appellate Court. We transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The defendant raises several issues on appeal. First, he claims that he was deprived of his federal constitutional right to effective assistance of counsel due to the refusal of the trial court, *Gormley, J.,* to remove his counsel after he had informed the court that he had filed a grievance against his attorney and the attorney had moved to withdraw as defense counsel. The defendant argues this refusal resulted in a per se violation of his right to effective assistance of counsel pursuant to the sixth amendment to the United States constitution.[3] Alternatively, the defendant argues that the trial court's refusal to remove defense counsel violated his right to

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person . . . or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[2] General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."

[3] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury to the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

the effective assistance of counsel because the filing of a grievance against his attorney resulted in a lapse of representation and created a conflict of interest on the part of the defendant's counsel. The defendant also argues that this action by the trial court violated his rights under article first, § 8, of the constitution of Connecticut.[4] Additionally, the defendant argues that the trial court improperly allowed a clinical social worker to testify as an expert witness on battered women's syndrome, and improperly permitted the social worker to testify as to case specific facts relative to the victim as a battered woman. Finally, the defendant claims that the trial court improperly permitted the state to introduce evidence of the defendant's prior misconduct and evidence that was the product of an unconstitutional search and seizure. We conclude that the defendant's constitutional rights were not violated and that the trial court properly admitted the expert testimony of the clinical social worker and the defendant's prior misconduct. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the fall of 1995, the then sixteen year old victim and the twenty-nine year old defendant began a sexual relationship. Over the next several months, the couple traveled from Allentown, Pennsylvania, where they both lived, to various destinations in New Jersey, New York and Connecticut, staying with various relatives and friends of the defendant. Throughout this period of time, there developed an escalating pattern of violence perpetrated against the victim by the defendant. This pattern began with an incident in the fall of 1995, in which the defendant hit the victim, tore her clothes and forced her to stay in his apartment instead of attending

---

[4] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

her high school classes that day. Thereafter, the pattern of violence progressed. In later incidents, the defendant hit the victim, stabbed her with a fork and knives, hit her with a beer can during a drive in November, 1995, and burned her with a cigarette at the end of December, 1995. At one point over the Christmas holidays in 1995, he held her down and cut her hair with a knife. At another point during this time period, he carved the name "Joey" on her chest with a piece of glass.

The incident at issue in this case occurred on January 7, and continued into the early hours of January 8, 1996. During that time, the defendant and the victim were staying in the apartment of Albert Gebeau, a friend of the defendant, at 142 Charles Street in Bridgeport. They had been there for a few days, during which time the defendant kept the victim locked in a bedroom with her eight month old son, providing her with food once a day. On the evening of January 7, the defendant entered the room and stabbed the victim repeatedly with a knife and then threw an air conditioner at her.[5] Thereafter, he cut the victim's nipple off of her right breast and forced her to swallow it. After administering further beating to the victim, the defendant ordered her to get up, clean herself off and to pack their bags because they were leaving the Charles Street apartment immediately. As they were leaving the bedroom in which the attack had transpired, they encountered Gebeau. Gebeau and the defendant argued and Gebeau said he was going to call 911 "because the blood was all over the place." Gebeau subsequently called 911.[6]

Meanwhile, the victim and the defendant left the Charles Street apartment, the victim carrying her child

[5] The jury also heard testimony regarding an alleged rape of the victim; however, the defendant was acquitted of the charge of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1).

[6] The transcript of the 911 telephone call was admitted as a full exhibit at trial and a transcript of the call was provided to the jury.

and the suitcases. There was a blizzard raging. After several attempts, the defendant was able to remove the car from the snow and he and the victim and her child left the Bridgeport area and drove to the Branford Motel. Due to the inclement weather conditions, which prohibited the car from traveling at normal speeds, it took them a "[c]ouple of hours" to get to the Branford Motel from Bridgeport. At no time did the defendant permit the victim to receive medical attention, despite her request for such aid. At the Branford Motel, they checked into a room. The defendant washed the victim's clothes in order to remove the blood and then forced her to smoke crack and to have sex with him. Thereafter, the telephone rang and, after the defendant answered it, the police arrived at the door. The police arrested the defendant and the victim was taken to Yale-New Haven Hospital for treatment for her injuries.

Initially, the victim told the police that Gebeau had inflicted her injuries because she was frightened of the defendant and did not want to implicate him. The next day, however, after learning that the defendant was imprisoned, the victim told the police that she had lied and that the defendant was the individual who had assaulted her. Additional facts will be provided where necessary.

I

We first address the defendant's primary argument that he was denied effective assistance of counsel as a result of the trial court's refusal to permit his counsel to withdraw. He originally made two claims: (1) that the trial court's refusal to remove counsel in light of the grievance the defendant had filed constituted a per se violation of his right to effective assistance of counsel; and (2) if not a violation per se, the trial court's refusal to remove counsel created a conflict of interest that violated the fairness of the defendant's trial.

The following additional facts are necessary for our analysis of the defendant's claims. Prior to the appointment of Lawrence Hopkins as special public defender, the defendant had been assigned three other attorneys as his trial counsel.[7] Hopkins had represented the defendant since January 15, 1997, and during that time he had filed at least seventeen motions on the defendant's behalf and had spoken with him on at least a few occasions. On September 2, 1997, the defendant alerted the trial court, *Maiocco, J.*, that he had filed a motion to dismiss his counsel on May 19, 1997. The court then conducted a preliminary inquiry[8] and subsequently granted the defendant a continuance until the following week to try to retain private counsel.[9] The court then granted Hopkins' request for a competency hearing for the defendant, stating: "[T]he court is having some

[7] The first public defender, Catherine Teitell, represented the defendant from February 8, 1996, until February 29, 1996, at which point it was discovered that the office of the public defender had a conflict of interest in its representation of the defendant. Frank Riccio was then appointed as special public defender. He represented the defendant until May 31, 1996, when it was discovered that his firm had represented members of the Gebeau family. At that time, Timothy Aspinwall was appointed as special public defender. Aspinwall represented the defendant until January 15, 1997, when Aspinwall withdrew, citing "[i]rreparable breakdown in communications between attorney and client." Hopkins was appointed to represent the defendant at that time.

[8] The court stated: "Well, see just by not being satisfied is not the criteria. It's whether or not effective assistance is being provided to you. Where you have an attorney appointed by the court and the court is satisfied that person is competent, whether you approve of the tactics or strategy or anything along that line is really not for you to say anymore. . . . I'd just like to know, I'm being asked to either delay this matter or have somebody removed or excused from the case. I have to know a little bit more about it. Have you interviewed witnesses in this?"

[9] The court stated: "I think at least what I can do for [the defendant] is give him the opportunity between this moment and by next Tuesday . . . if he can have an attorney show up here on his behalf who is ready to go forward with trial I would certainly release Mr. Hopkins from further obligation. If he is not capable of getting an attorney in here ready to go forward, a private attorney, I see no other grounds to dismiss Mr. Hopkins from this case."

thoughts about whether or not you fully are capable to assist any attorney in your defense and certainly evaluation may help the court in making that determination."[10] When next before the trial court, *Ronan, J.*, the court stated that the defendant was competent and cautioned the defendant, who had not attained private counsel, that it would be both unwise and difficult to change attorneys at such a late stage in the case's progress.[11]

The trial began on December 3, 1997. Before the start of jury selection, the defendant addressed the court, *Gormley, J.*, arguing that Hopkins had not told him jury selection was commencing that day and that he was, as a result, dressed inappropriately for his appearance in court.[12] The defendant also reiterated his complaints against Hopkins, saying: "May I say to the court, and it will be on the record, if I select a jury today it will be against my will. I wish not his representation . . . ." The court refused to remove Hopkins from the case and jury selection ensued. On December 5, 1997, the court announced that it had been advised that the defendant had filed a grievance against Hopkins with the

---

[10] Subsequently, the competency hearing was waived and the defendant stipulated to competency.

[11] The court stated: "[J]ust so you understand . . . there's got to be a valid and substantial reason to replace your attorney. You can't just come into court, he's a special public defender representing you, he's an experienced attorney, he's handled many cases here and does it well, and I'm not going to merely just put somebody on the case unless you can justify it. And that takes a little bit of doing. . . . If your family hired somebody, that's fine, they can do that anytime they want. Your case, however, is high on the list, it has been here some time, and I think you should give it a lot of thought before you change lawyers at this point in time, in view of the status of your case . . . ."

[12] The court noted that the defendant was not dressed inappropriately, stating: "There is nothing obvious about what you're wearing today that indicates any degree of confinement. You're wearing a blue sweat shirt [with no markings on it]."

statewide grievance committee.[13] The court gave the defendant the opportunity to express his dissatisfaction with his representation. The defendant stated: "Just that counsel and I have not discussed this case thoroughly. There's aspects in this case that I feel like I could shed light upon. He disregards . . . . Really counsel's actions are not to my satisfaction." Hopkins then made a motion to withdraw his appearance as the defendant's counsel. Hopkins stated: "[W]hen it is brought to my attention that in fact a grievance was filed, I feel that it is incumbent on me to move to withdraw simply because at the very least there is a stark appearance of impropriety in my continuing to represent an individual [who has] filed a grievance against me." After questioning both the defendant and Hopkins about the reasons for their respective motions, the court denied both.[14]

---

[13] The court entered into evidence a letter from the statewide grievance committee to the defendant, dated November 13, 1997, acknowledging its receipt of a request for information from the defendant. A copy of the defendant's grievance to the statewide grievance committee was not presented and it was indicated that the committee did not, at that time, have the document in its files. The defendant indicated he had sent the grievance to the committee the prior week.

[14] In its denial of Hopkins' motion to withdraw, the court stated: "I denied the motion to remove Mr. Hopkins on Wednesday of this week because I had heard nothing that would prompt me to relieve him. He is a man who has tried cases before me over the years, going back certainly over a seven or eight year period. He's been a special public defender here . . . in this court and for a long time he was the public defender in Hartford. He is a person that I have even told him I think he is an extremely capable trial lawyer and gets probably more mileage out of a case than most other people do in the same kind of work.

"The fact that this defendant now has filed a grievance is simply not reason to deny justice to the other parties in this case, talking about incidents that are alleged to have taken place in January of 1996, almost two years ago. . . . I am not going to allow a pattern of conduct which I see in this record of the defendant who is basically trying to avoid having this case tried, and I am not going to allow him to control the situation. I am the one that is controlling the situation.

"Mr. Hopkins, I understand your position. I think you have done the right thing to protect your own interest by moving to withdraw. But that motion is denied. And we are going to proceed with this case posthaste."

On December 9, 1997, the court permitted State Representative Edna Garcia of Bridgeport to address the court and express her concern about the quality of the defendant's representation. Once again, the court asserted its belief in the high quality of Hopkins' legal acumen and denied the defendant's motion for a continuance in order to seek new counsel. Hopkins then ensured that the record reflected that he personally had moved to withdraw from the case and that that motion also had been denied. The trial then commenced.

We first address the defendant's claim that the denial of his repeated motions for withdrawal of counsel and appointment of new counsel represent a per se violation of his federal constitutional right to effective assistance of counsel. He based this claim on precedents set forth pursuant to the sixth amendment to the United States constitution.[15] We disagree with the defendant and shall

[15] The defendant suggests that article first, § 8, of the Connecticut constitution provides even greater protection than its federal counterpart, but he fails to provide an adequate legal analysis of the basis of this claim. We decline to reach the defendant's state constitutional claim of ineffective assistance of counsel because it was inadequately briefed pursuant to the standard this court enunciated in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992). As we concluded in *Geisler*, "[i]n order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the *textual approach* . . . (2) *holdings and dicta of this court* . . . (3) *federal precedent* . . . (4) *sister state decisions* or sibling approach . . . (5) the *historical approach,* including the historical constitutional setting and the debates of the framers . . . and (6) *economic/sociological considerations.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 684–85. " 'We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the [defendant] has provided an independent analysis under the particular provisions of the state constitution at issue.' *State* v. *Robinson*, 227 Conn. 711, 721, 631 A.2d 288 (1993); see also *Luce* v. *United Technologies Corp.*, [247 Conn. 126, 142 n.22, 717 A.2d 747 (1998)]; *State* v. *Crespo*, 246 Conn. 665, 685 n.15, 718 A.2d 925 (1998) [cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999)], and cases cited therein. Further, [in the due process context] where the [defendant] asserts a constitutional violation on both federal and state due process grounds 'without developing his argument either in his brief or at oral argument, we deem his due process claims to be abandoned. *Hayes* v.

limit our analysis of his argument to that which falls within the purview of the federal constitution and to the extent to which that is applied to the states pursuant to the fourteenth amendment.[16]

Before reviewing the defendant's claim, we underscore that our review is of the actions of the trial court, not of the actions of defense counsel. "Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 687–88, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). Our analysis, therefore, is restricted to the actions of the trial court, specifically its refusal to grant the defendant's motion for appointment of new counsel and Hopkins' motion to withdraw.[17]

*Smith*, 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984); Rodriguez v. *Mallory Battery Co.*, 188 Conn. 145, 149, 448 A.2d 829 (1982).' *Ganim* v. *Roberts*, 204 Conn. 760, 765 n.5, 529 A.2d 194 (1987)." *Barton* v. *Ducci Electrical Contractors, Inc.*, 248 Conn. 793, 820, 730 A.2d 1149 (1999).

[16] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."

[17] We decline to review, therefore, the defendant's claims that Hopkins improperly declined to call specific witnesses, failed to conduct interviews, failed to inform the defendant as to the beginning of jury selection, failed

It is well established that the sixth amendment to the United States constitution guarantees the right to effective assistance of counsel. "The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment . . . guarantee[s] . . . a criminal defendant the right to effective assistance of counsel. *Powell* v. *Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). *Festo* v. *Luckart*, supra, 626–27. This right requires that the assistance of counsel be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. *Glasser* v. *United States*, 315 U.S. 60, 70, 62 S. Ct. 457, 86 L. Ed. 680 (1942); *State* v. *Marion*, 175 Conn. 211, 216, 397 A.2d 533 (1978). Moreover, one of the principal safeguards of this right is the rule announced by this court that [a trial] court must explore the possibility of conflict . . . when it knows or reasonably should know of a conflict . . . . *Festo* v. *Luckart*, supra, 629." (Internal quotation marks omitted.) *State* v. *Martin*, 201 Conn. 74, 78–79, 513 A.2d 116 (1986).

"The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

to engage in meaningful dialogue with the defendant, and improperly moved to have the defendant's competency assessed.

adversarial process that the trial cannot be relied on as having produced a just result." (Citations omitted.) *Strickland* v. *Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* established a two-pronged test for the assessment of ineffective assistance of counsel. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." Id., 687.

Prejudice may be presumed in some sixth amendment contexts, such as the actual or constructive denial of assistance of counsel altogether or various forms of state interference with counsel's assistance. Id., 692. In the context set forth by the present case—that of counsel allegedly burdened by a conflict of interest—there is no presumption of prejudice per se. "Prejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler* v. *Sullivan* [446 U.S. 335, 348–50, 100 S. Ct. 1078, 64 L. Ed. 2d 333 (1980)]." (Internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 692. The Second Circuit Court of Appeals has honed this test further. "Once a defendant has established that there is an actual conflict, he must show that a lapse of representation . . . resulted from the conflict. . . . To prove a lapse of representation, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. . . . Finally, [w]hether a defendant's representation was constitutionally inadequate is a mixed question of law and fact and thus we exercise de novo review." (Citations omitted; internal quotation marks omitted.) *United States* v. *Stantini*, 85 F.3d 9, 16 (2d Cir. 1996).

In the articulation of his claim of a per se violation, the defendant originally had argued that the mere filing of the grievance against his attorney created a conflict of interest that so affronted his right to effective assistance of counsel as to constitute a per se violation of that right. At oral argument before this court, however, defense counsel qualified this assertion, claiming that the substance of the grievance had to be sufficient to support a claim of conflict of interest. We conclude that the filing of a grievance in and of itself is insufficient to establish a violation of a defendant's sixth amendment rights.

The defendant claims that if this is not a per se violation of his constitutional right to effective counsel, it is still a violation of that right pursuant to traditional conflict of interest analysis. This court previously has articulated that "[t]here are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . . A trial court's failure to inquire in such circumstances constitutes the basis for reversal of a defendant's conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 686.

For example, in *State* v. *Martin*, supra, 201 Conn. 81, this court determined that the trial court has an affirmative duty to investigate defense counsel's timely assertion regarding the existence of a conflict of interest. In *Martin*, a conflict of interest arose during the direct examination of the state's final witness. Id., 77. The trial court summarily denied the defense counsel's motion to withdraw and motion for a mistrial without conducting an inquiry as to the conflict. Id. In reversing the judgment of the trial court, we stated: "[T]he trial court was under a duty to investigate the defense coun-

sel's assertion of a conflict of interest. . . . Yet, without inquiry as to the legitimacy of the attorney's assertion, the court summarily denied the defendant's motion. This was error. To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court has an affirmative obligation to explore the possibility of conflict when such conflict is brought to the attention of the trial judge in a timely manner. See *Holloway* v. *Arkansas*, [435 U.S. 475, 485–86, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978)]; *Festo* v. *Luckart*, supra [191 Conn. 626]. [In *Martin*], as in *Wood* [v. *Georgia*, 450 U.S. 266, 272, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981)], the record does demonstrate that the *possibility* of a conflict of interest was sufficiently apparent . . . to impose upon the court a duty to inquire further. . . . [Id.] While *Holloway* v. *Arkansas*, supra, 486, emphasized that it was not transferring to defense counsel the authority of the trial judge to rule on the existence or risk of a conflict, the trial court must be able, and be freely permitted, to rely upon counsel's representation that the possibility of such a conflict does or does not exist. *Kaplan* v. *United States*, 375 F.2d 895, 897 (9th Cir.), cert. denied, 389 U.S. 839, 88 S. Ct. 67, 19 L. Ed. 2d 103 (1967); *Willis* v. *United States*, 614 F.2d 1200, 1206 (9th Cir. 1980). The reliance in such an instance is upon the solemn representation of a fact made by [the] attorney as an officer of the court. *Kaplan* v. *United States*, supra [897]. The course thereafter followed by the court in its inquiry depends upon the circumstances of the particular case." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Martin*, supra, 81–82.

In the present case, unlike in *Martin*, the trial court conducted an appropriate inquiry, following the guidelines set forth in *Strickland* and *Stantini*. The defendant's counsel claimed that the defendant's filing of a grievance against him created a conflict of interest in

his representation of the defendant. Hopkins asserted this claim before the trial began and the trial court inquired as to the nature of the defendant's complaints about his representation and assessed the alleged conflict of interest. Following its inquiry, the trial court concluded that there was not a conflict of interest.[18]

[18] On December 5, 1997, the following colloquy between the defendant, the court and Hopkins took place:

"The Court: . . . I do want to ask you, Mr. Vega, some questions about this matter. Because apparently you do not have a copy of the document you sent to the grievance committee.

"The Defendant: No, I don't.

"The Court: You do not?

"The Defendant: No, sir.

"Mr. Hopkins: Stand up.

"The Court: All right. Have you in fact filed a grievance against Mr. Hopkins?

"The Defendant: Yes, I have.

"The Court: And when was that done?

"The Defendant: It was approximately Tuesday last week.

"The Court: Of last week?

"The Defendant: Yes.

"The Court: All right. The record should further reflect that Mr. Hopkins did call the grievance committee in East Hartford and they indicated that they either don't have it logged in or don't have it there yet, but it's possible that it's somewhere in the paperwork. Do you have anything, a copy of anything that would indicate what your claims are against Mr. Hopkins?

"The Defendant: No, Your Honor, except just my memory.

"The Court: All right. Would you indicate for me as best your memory allows you what is it you have grieved Mr. Hopkins for? . . .

"The Defendant: . . . Just that counsel and I have not discussed this case thoroughly. There's aspects in this case that I feel like I could shed light upon. He disregards . . . . Really counsel's actions are not to my satisfaction. He ignores my request to interview associates who can describe me as who I am. . . .

"The Court: But is there anything further? . . . So your basic claim with the grievance committee are pretty much the same things you told me here Wednesday of this week as to why you wanted me to dismiss Mr. Hopkins.

"The Defendant: Exactly.

"The Court: All right. Mr. Hopkins, I gather you have indicated in chambers that you wish to move to withdraw from the case.

"Mr. Hopkins: Yes, Your Honor. Under the circumstances, and I am always very reluctant to make that motion, as the court is probably aware. However, when it is brought to my attention that in fact a grievance was filed, I feel that it is incumbent on me to move to withdraw simply because at the very

We conclude that the trial court conducted an appropriate inquiry as to the conflict of interest alleged by Hopkins and the potential violation of the defendant's sixth amendment rights. We are satisfied that this inquiry was sufficient to establish that the defendant's grievance against Hopkins' representation did not meet the threshold necessary to prove prejudice and that the conflict of interest posed by the filing of the grievance did not adversely affect the nature of that representation. The defendant's complaints were vague and generally amounted to disagreements with his attorney's tactical or strategic decisions, and his concern that he had not had the opportunity to meet with Hopkins more frequently. The trial court determined that such insignificant and unsubstantiated complaints did not raise a specter of conflict sufficient to postpone the defendant's trial yet again. We agree and, accordingly, we affirm the trial court's denial of the motions for appointment of new counsel and withdrawal of representation.

## II

The defendant next argues that the trial court improperly allowed Sharon Davis, a clinical social worker, to testify as an expert witness on battered women's syndrome. The defendant claims that Davis did not meet the standard necessary to be considered an expert witness. He argues that Davis did not possess the requisite special skill or knowledge on the subject of battered

least there is a stark appearance of impropriety in my continuing to represent an individual [who has] filed a grievance against me. . . ."

The trial court then questioned the defendant about certain grievances he had filed against other attorneys in the past.

"The Court: . . . The court is going to deny the motion of counsel to withdraw in this case, and I am going to state my reasons for the record."

The trial court then reviewed the procedural history of the case, focusing on the changes in the defendant's representation and what the trial court perceived and presented as a strategy of delay perpetrated by the defendant. See footnote 14 of this opinion.

women's syndrome that would qualify her as an expert witness. We disagree.

"As a threshold matter, we set forth the standard by which we review the trial court's determinations concerning the [admissibility] of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . .

"Concerning expert testimony specifically, we note that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 123, 763 A.2d 1 (2000); see also *State* v. *Ali*, 233 Conn. 403, 431, 660 A.2d 337 (1995).

At trial, Davis testified that she worked as a senior clinical social worker in the emergency room at Yale-New Haven Hospital. She holds a bachelor's degree in sociology and a master's degree in domestic violence. She has worked in the field for more than twenty years, during which time she has encountered hundreds of women who have been involved in domestic violence. She personally has counseled many of these women.

She characterized her postgraduate career as being "on call, and the primary goal is looking at victims, whether they were sexual[ly] assault[ed] women who had been domestically abused." She testified additionally as to her personal experience with diagnosing and counseling battered women. She explained that she had participated in an intensive seminar on battered women's syndrome and that she has read literature on the subject. She has conducted community forums in New Haven for people experiencing domestic violence. She also has trained doctors and nurses at both Bridgeport Hospital and Yale-New Haven Hospital as to the diagnostic characteristics and the unique needs of victims of domestic violence. The trial court determined that Davis was qualified as an expert, stating: "[O]n th[e] basis [of her lengthy experience in the field], her educational background, the field she's been working in for over twenty years, the fact that as these terms [associated with battered women's syndrome] become more prominent she's been devoting more and more of her time to this area, the court finds she is an expert in this case."

On appeal, we conclude that the trial court reasonably could have concluded, on the basis of the evidence before it, that Davis is an expert on battered women's syndrome. Moreover, we note that Davis' testimony is particularly crucial to the jury in this case because although battered women's syndrome has become known to the public more widely than it was in the past, much of the subject still remains beyond the ken of the average juror. Indeed, "[c]ommentators have noted that the research data indicates that potential jurors may hold beliefs and attitudes about abused women at variance with the views of experts who have studied or had experience with abused women. In particular, males are likely to be skeptical about the fear the woman feels in an abusive relationship and about her

inability to leave a setting in which abuse is threatened." (Internal quotation marks omitted.) *State* v. *Borrelli*, 227 Conn. 153, 167, 629 A.2d 1105 (1993). Reliance, therefore, on an expert such as Davis in a case such as these is well warranted. We conclude that the admission of Davis' testimony was well within the discretion of the trial court and that Davis' testimony properly was admitted.

### III

The defendant also argues that Davis' testimony improperly was admitted because it was case specific and went to the credibility of the victim of this particular assault, and not to the experience of battered women generally. The defendant failed to object to any of Davis' testimony at trial. This claim, therefore, is unpreserved for review. The defendant, however, argues that Davis' testimony "affect[ed] the fairness and integrity of and public confidence in the judicial proceedings"; (internal quotation marks omitted) *State* v. *Day*, 233 Conn. 813, 849, 661 A.2d 539 (1995); and that, as a result, the admission of Davis' testimony constitutes plain error. We disagree.

"The plain error doctrine of Practice Book § 60-5 requires a defendant to demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . We repeatedly have observed that plain error is not even implicated unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Woods*, 250 Conn. 807, 814, 740 A.2d 371 (1999). Our review of Davis' testimony leads us to conclude that the trial court's admission of her testimony did not constitute plain error.

We have noted previously the critical distinction between generalized expert testimony and that which crosses the line into case specific inadmissibility. "The cases that have considered this issue have noted the critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." *State* v. *Spigarolo*, 210 Conn. 359, 379, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). In *Spigarolo*, we considered the testimony of an expert on child victims of sexual abuse. Id., 376. We concluded that "where defense counsel has sought to impeach the credibility of a complaining minor witness in a sexual abuse case, based on inconsistency, incompleteness or recantation of the victim's disclosures pertaining to the alleged incidents, the state may offer expert testimony that seeks to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents." Id., 380.

In the present case, as in *Spigarolo*, defense counsel had attempted to impeach the credibility of the victim's testimony. Davis' testimony, therefore, was offered to substantiate the state's argument that the victim is a battered woman and that her testimony must be considered in that context. Davis' testimony was couched in terms general enough to encompass her area of expertise: the experience commonly shared by battered women. For example, when questioned as to the victim's returning to Allentown, Pennsylvania and bringing her child "back into . . . that situation where the abuse had occurred," Davis responded: "Well, in this particular case she did not think that [the defendant] would abuse the child, the child became a defense in terms of protecting her from abuse. *And we see that with women who bring their children and they would say to us, but he doesn't beat my children. So that they*

*would use their children to protect themselves from abuse.*" (Emphasis added.) Our review of the record leads us to conclude, therefore, that Davis was comparing the victim's experience to other victims of similar experiences, and was not assessing the credibility of what the victim had said. Davis was providing the jury with a framework within which it could place and possibly explain the victim's alleged behavior. See *State* v. *Spigarolo*, supra, 210 Conn. 380. This is within the accepted role of the expert witness. Consequently, the defendant's plain error claim must fail.

## IV

The defendant next argues that his conviction should be reversed because the trial court improperly concluded that evidence of the defendant's prior misconduct was evidence of a demonstrable system of criminal activity and, therefore, improperly admitted such evidence. The defendant specifically objects to the admission of evidence of the demonstrable pattern of escalating violence perpetrated upon the victim. The defendant argues that the evidence of prior misconduct was not relevant to the charges against him[19] and that it was more prejudicial than probative. We disagree.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story

---

[19] The defendant concedes that the evidence that he stabbed the victim in the hand is sufficiently related to one of the charges against him, but he argues that it, too, was more prejudicial than probative.

of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 424–25, 630 A.2d 1043 (1993).

Our standard of review on such matters is well established. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Citations omitted; internal quotation marks omitted.) Id., 426–27.

In the present case, the state presented evidence that the victim was a battered woman, suffering from what has been classified as battered women's syndrome. The state's expert testified as to the cyclical nature of the violence perpetrated upon these women by their batterers.[20] Evidence of the defendant's prior acts toward the

[20] Davis' testimony regarding battered women's syndrome included the following: "Starting with the initial assault, what happens is we notice that there's good and bad, that the assault happens, then there may be a honeymoon period. But the tension meanwhile is escalating between them in the relationship. It doesn't get better; it gets worse. And it gets progressively worse. So the assaults get worse. So it may start with a slap in the face,

victim corroborated Davis' testimony. The course of conduct—beginning with minor assault, building to the carving of the name "Joey" on the victim's chest, and escalating to the horrific events of January 7 and 8, 1996—was properly offered to prove a system of activity on the part of the defendant. We conclude that evidence of the defendant's prior incidences of violence toward the victim was relevant to the prosecution's case in that it demonstrated the manifestation of the battered women's syndrome as it affected the victim. We conclude, therefore, that the evidence of the defendant's prior misconduct substantiates the theory that there existed a system of criminal activity on the part of the defendant. We find no impropriety in the admission of this prior misconduct evidence.

We next address the defendant's contention that the trial court improperly admitted such evidence of prior misconduct because it was more prejudicial than probative. This claim is without merit.

"We previously have held that evidence of dissimilar acts is less likely to be prejudicial than evidence of similar or identical acts. [Id.], 427 (possession of marijuana not overly prejudicial when defendant charged with murder); see also *State* v. *Santiago*, 224 Conn. 325, 340, 618 A.2d 32 (1992) (possession of stolen weapon and murder are disparate acts of misconduct)." *State* v. *Cator*, 256 Conn. 785, 800, 781 A.2d 285 (2001). In the present case, the evidentiary substantiation of the vicious depravity of the conduct for which the defendant was charged far outweighed the prejudicial impact of the prior misconduct. The prior misconduct at issue included evidence of prior assaults against the victim; however, none of these assaults was on a par with or

and then ends up with a broken arm or with a fractured rib or multiple contusions or a stabbing or a slashing, and it goes on. This part gets less, there is less good times and more tension and more battering."

even similar to the brutality of the incidents that took place on January 7 and 8, 1996. The unique brutality of slicing off the victim's nipple and forcing her to swallow it, combined with the other assault on the night in question, forces us to consider all other evidence as disparate acts, which, when taken as a whole, form the cyclical pattern that led inexorably to this specific conduct. We conclude that the prior misconduct is admissible as evidence of the escalating pattern of abuse commonly understood to be experienced by battered women, and that it is admissible as more probative of the defendant's conduct on the night in question than prejudicial as to the defendant's behavior in general.

V

Finally, the defendant contends that the trial court improperly admitted evidence obtained from his motel room that was the product of an unconstitutional search and seizure in violation of his rights pursuant to the fourth amendment to the United States constitution.[21] We reject this claim.

At trial, and over defense counsel's objections, the court admitted as evidence a knife that had been found in the breast pocket of the defendant's coat. This coat initially had been hanging in the motel room when two police officers entered the room, subdued and handcuffed the defendant. Officer Mark Ciarciello testified that prior to taking the defendant outside into the ongoing blizzard, the officers decided to place his coat over him. Before doing so, they searched the coat for weapons. At that time, they found the knife in the coat pocket. The defendant made no objection to the constitutional-

---

[21] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

ity of the admissibility of this evidence at trial.[22] He now asks this court to review the constitutionality of his claim pursuant to the standard we have articulated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[23] We conclude that the defendant's claim does not prevail under *Golding* and, therefore, we affirm the decision of the trial court.

The defendant's argument fails to satisfy the third prong of the *Golding* test. "It is a basic principle of constitutional law that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. . . . The fourth amendment's requirement that a warrant issue from a neutral and detached judicial officer rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities. . . . [H]owever, the fourth amendment proscribes only unreasonable searches and seizures, and there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers. Thus, where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . a warrant will not be required." (Citations omitted; internal quotation marks omitted.) *State*

---

[22] Defense counsel did object to the admissibility of the knife on the ground that it was prejudicial.

[23] In *State* v. *Golding*, supra, 213 Conn. 239–40, we concluded that a defendant may prevail on a claim unpreserved at trial if the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

v. *Januszewski*, 182 Conn. 142, 151–52, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); see *Chimel* v. *California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) (possible harm to police officer constitutes reasonable cause for warrantless search).

"Our past cases indicate . . . that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that [a warrantless search], limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See *Terry* [v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]. [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Id., [27]. . . . If, while conducting a legitimate *Terry* search . . . the officer should, as here, discover . . . weapons, he clearly cannot be required to ignore the [weapons], and the Fourth Amendment does not require [their] suppression in such circumstances." (Internal quotation marks omitted.) *Michigan* v. *Long*, 463 U.S. 1032, 1049–50, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

In the present case, the police were summoned to the Branford Motel in response to an alert from the Bridgeport police that there had been an incident involving a serious assault. Finding the defendant, who matched the physical description of the suspect, at the motel with the bloodied victim, they had reasonable

cause to suspect that the defendant was dangerous. Accordingly, searching the coat before placing it on the defendant was reasonable under the circumstances. The search was not unconstitutional and, therefore, does not satisfy the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other justices concurred.