936 A.2d 701 (2007)
105 Conn.App. 84
STATE of Connecticut
v.
Kevin EPPS.
No. 27804.
Appellate Court of Connecticut.
Argued September 20, 2007.
Decided December 25, 2007.
*703 Darcy McGraw, special public defender, for the appellant (defendant).
Toni M. Smith-Rosario, assistant state's attorney, with whom, on the brief, were David I. Cohen, state's attorney, and Maureen Ornousky, senior assistant state's attorney, for the appellee (state).
FLYNN, C.J., and GRUENDEL and FOTI, Js.
FOTI, J.
The defendant, Kevin Epps, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59(a)(2), and kidnapping in the first degree with the intent to inflict physical injury and with the intent to terrorize in violation of General Statutes § 53a-92(a)(2)(A) and (C).[1] The jury found the defendant not guilty of attempt to commit *704 murder in violation of General Statutes §§ 53a-54a(a) and 53a-49. On June 1, 2005, the defendant was sentenced to a total effective term of thirty-five years incarceration. On appeal, the defendant claims that the court improperly (1) admitted uncharged misconduct evidence and graphically disturbing photographs of the victim's injuries, (2) deprived the defendant of a fair trial by improperly admitting certain evidence and (3) deprived the defendant of a fair trial by permitting testimony of a "circle of violence" syndrome without any expert testimony. We disagree, and we therefore affirm the judgment of the trial court.
The jury reasonably could have found the following facts. The victim[2] and the defendant dated on and off for about five years, beginning in 1999, and ending at the time of the incident in question on January 10, 2004. In December, 2003, the victim and the defendant became engaged. Three days prior to the incident in question, the defendant informed the victim that he had tested positive for the sexually transmitted disease, chlamydia. The chlamydia diagnosis sparked several arguments between the victim and the defendant.
The victim's relationship with the defendant was a "cycle," in which they fought, she got upset and stayed away from him for a short time but eventually took him back. The victim had had enough of the circular pattern. After learning that the defendant had contracted a sexually transmitted disease, the victim decided that the relationship had to end because she believed the defendant was not being faithful to her. She telephoned the defendant on January 10, 2004, and told him that they needed to talk because their relationship was over. On that day, the defendant met the victim after work at the Stamford train station. The victim wanted to end the relationship with the defendant that night. They stopped at a couple of bars in the vicinity of the train station before the defendant drove them to Rosa Hartman Park in Stamford.
When they arrived at the park, the victim told the defendant that she did not want to marry him and that she did not love him, and, in response, the defendant punched her in the face. The defendant subsequently pulled her into the backseat of the van and attempted to choke her several times. Eventually, the victim sat in the front seat to talk to the defendant in an attempt to calm him down. At that point, she felt her pants become wet. She then looked down and saw a gasoline can and a book of matches in his hands. The defendant then struck a match and set her on fire.
The defendant's version of events was different. He denied that the chlamydia diagnosis caused any disagreements. According to him, the couple went to the park and started talking and being intimate. He took several telephone calls on his cellular phone while the victim was in the van, and she became jealous that he might have been talking to females during his telephone conversations. At that point, the defendant told her they needed to separate for a little while because she was unnecessarily jealous. Upon hearing this, the victim attacked him, scratching his face and telling him she was going to kill him. The defendant admitted that he hit the victim at least once, though possibly two or three times. Because the victim was attacking him, the defendant decided to get out of the van and to walk away to gather his thoughts. While he was walking *705 around the van, he saw a flash and then he noticed that the victim was on fire.
When the victim got out the passenger door, the defendant ripped her shirt off and rolled her on the ground in an attempt to put the fire out. He then claimed that he put her back in the van and drove her to a hospital. The defendant testified that the victim told him not to tell anyone about what had just happened and to tell everyone that it was just an accident. In contrast, the victim claimed that as soon as she caught on fire, she got out of the van and began to throw dirt on herself to put the fire out. She testified that the defendant did not help her and only stood watching her with his hands in his pockets. The victim then dragged herself to the van, and the defendant drove her to the hospital.
After the victim had been taken into the trauma room at the hospital, an employee of the hospital, Letitia Williams, spoke to the defendant in an attempt to gather information regarding the victim. In speaking with Williams, the defendant referred to the victim as his wife, asking someone to help his wife. When Williams asked for information regarding the victim, the defendant did not provide her correct birth date. He told Williams that the victim had lit a cigarette while he was putting gasoline into his van at a gasoline station and there was an explosion. Williams asked if the victim had any family members, and the defendant stated that she did not. The defendant knew, however, that the victim's sister lived in Stamford. When Williams asked the defendant if she could have his cellular telephone, he refused to give it to her because he did not want her to give it to the police. Moreover, the defendant never complained to Williams that he had been burned in the incident.
When the police arrived at the hospital, they also spoke to the defendant. The defendant told Officer George Moran of the Stamford police department that his name was Jeffrey Epps, not Kevin Epps. The defendant was evasive regarding any information about the victim, and when asked if the victim had any family in the area, the defendant responded that all of her family was in Panama. Finally, the defendant relayed to the police a story similar, though not identical, to the one he had told Williams regarding how the victim was burned. He told the police that he was preparing to leave a friend's house when he decided to put more gasoline into the van. He claimed that as he was putting gasoline into the van from the gasoline can he carried in it, the victim exited the vehicle, stood behind him and lit a cigarette. The defendant stated that after putting enough gasoline in the van, he withdrew the can from the tank and upon doing that, some of the gasoline splashed onto the victim and immediately ignited.
The victim was taken to the Westchester Medical Center in Valhalla, New York, because of the severity of her burns. Karen Buckley, a physician who treated the victim there, testified about the victim's injuries. The victim had sustained severe, disfiguring burns over nearly 30 percent of her body, including her face, eyelids, neck, hands, abdomen and thighs. The pattern of the victim's burns indicated that the victim was not standing at the time of the fire because the accelerant would have run down her legs, causing burns down her legs, which did not happen. It appeared that a very large volume of fluid had been spilled or poured on the victim while she was sitting.
Several police officers arrived at the Westchester Medical Center to speak to the victim about the incident. Although she could only nod her head yes or no, the *706 police officers believed that they had gained a clear understanding of what had occurred on the evening of January 10, 2004. As a result of the interview, an arrest warrant was issued, and the defendant was arrested. Additional facts will be set forth as necessary.

I
The defendant raises two evidentiary claims. He claims that the court improperly (1) admitted uncharged misconduct evidence and (2) admitted photographs of the victim's injuries. "Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . [E]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) State v. Rolon, 257 Conn. 156, 173, 777 A.2d 604 (2001).

A
The defendant claims that the court improperly admitted uncharged misconduct evidence. Specifically, the defendant claims that the admission of the uncharged misconduct evidence was improper for two reasons: (1) it assumed that he and the victim were involved in "syndrome" behaviors without any evidence of the existence or elements of such a "syndrome"; and (2) the court failed to limit the scope of the evidence to prevent undue prejudice to him.
Additional facts are relevant to the defendant's claim. During the trial, the victim testified about several incidents during which the defendant allegedly assaulted her. First, the defendant caused the victim to crash her motor vehicle into a pole because he was punching her while she was driving. Second, the victim and the defendant were at the home of his cousin when she awoke because the defendant was punching her in the face. Third, when the victim was at the defendant's house on one occasion, she left the house while holding his motorcycle keys. Because the defendant wanted the keys, he ran out of his house, grabbed her by the legs and flipped her upside down so that she fell down a flight of cement stairs.
Prior to any testimony being given, the defendant objected on the ground that the evidence should not be admitted because it did not pertain to motive, intent, mistake, identity or common plan or scheme  the only grounds on which uncharged misconduct evidence can be admitted. The court overruled the defendant's objection stating: "The state argues that [the uncharged misconduct] goes to the defendant's motive and intent on the evening in question, and I agree." The court also stated that it would give the jury a limiting instruction when the evidence was introduced and again during the final charge. After the state elicited testimony from the victim regarding the first incident, the defendant again objected to the admission of this uncharged misconduct evidence. The defendant objected on the ground that the victim was providing too much detail regarding the prior incidents of misconduct by the defendant. Therefore, he argued, there was a "trial within a trial" being created for each incident of misconduct. Furthermore, the defendant stated that he wanted to limit the amount of detail regarding these incidents. The court ruled, however, that it would give the state latitude with its direct examination of the victim regarding these prior incidents of misconduct. Nevertheless, the court stated that the defendant could object when he believed it was appropriate, and the court would give the jury a limiting instruction at the conclusion of the testimony.
*707 Additionally, the victim, in testifying about her relationship with the defendant, mentioned the word "circle" a handful of times. The defendant never once objected to the use of this term. In arguing as to why the uncharged misconduct evidence should be admitted, the state noted that it had included an expert on its witness list who would be testifying with regard to domestic violence and "the circle of violence." The prosecutor argued that she had to lay a foundation for the expert testimony and was attempting to do so by questioning the victim about previous alleged assaults by the defendant. The defendant became aware, at the end of the state's case, that the state was not going to call its expert on domestic violence and the circle of violence, but the defendant never objected to the lack of expert testimony.

1
On appeal, the defendant first argues that the court improperly admitted uncharged misconduct evidence because it was admitted to establish the existence of a "circle of violence syndrome" in the absence of any expert testimony regarding this syndrome. The defendant, however, did not raise this claim at trial. "It is well established that generally this court will not review claims that were not properly preserved in the trial court." (Internal quotation marks omitted.) State v. Spillane, 69 Conn.App. 336, 341, 793 A.2d 1228 (2002). "Where a defendant fails to seek review of an unpreserved claim under either [State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989)] or the plain error doctrine [set forth in Practice Book § 60-5], this court will not examine such a claim." (Internal quotation marks omitted.) Id. In the present case, the defendant did not raise this claim at trial, nor did he request review of the claim under Golding or the plain error doctrine. Therefore, we decline to review this claim.

2
The defendant also argues that the court improperly admitted the uncharged misconduct evidence because the court failed to limit it to prevent undue prejudice caused by the unrestricted admission of the evidence. "As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .
"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation marks omitted.) State v. Vega, 259 Conn. 374, 396-97, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S.Ct. 152, 154 L.Ed.2d 56 (2002).
"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only *708 where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) Id., at 397, 788 A.2d 1221.
Our review of the record leads us to conclude that the court did not abuse its discretion in admitting the uncharged misconduct evidence. The court properly held that the evidence was relevant in terms of the defendant's motive and intent on the evening in question. In addition, the uncharged misconduct evidence was more probative than prejudicial. "We previously have held that evidence of dissimilar acts is less likely to be prejudicial than evidence of similar or identical acts." (Internal quotation marks omitted.) Id., at 398, 788 A.2d 1221. In Vega, the court held that the prior misconduct at issue included evidence of similar assaults against the victim, but "none of these assaults was on a par with or even similar to the brutality of the incidents that took place [on the night in question]." Id., at 398-99, 788 A.2d 1221. Similarly, in the present case, the uncharged misconduct concerned the defendant's having assaulted the victim on prior occasions when he punched her, hit her head against a car door and caused her to fall down cement stairs. Those prior assaults, however, were not as brutal as pouring gasoline on the victim and igniting it, causing burns to almost 30 percent of her body. Because the uncharged misconduct evidence was relevant to both motive and intent and was more probative than prejudicial, we conclude that the court did not abuse its discretion in admitting the evidence.

B
The defendant also claims that the court improperly admitted photographs of the victim's injuries. Specifically, he argues that they were prejudicial because of the number of photographs admitted, sixteen, and because they graphically depicted the victim's injuries. During the trial, the state offered into evidence several photographs through the testimony of one of the victim's physicians. The defendant objected to the introduction of these photographs on the ground that the sheer number of photographs along with the graphic nature of the photographs would serve to inflame the jury, thereby causing him prejudice. The court overruled the defendant's objection, finding that the probative value of the photographs outweighed any prejudicial effect. We agree.
We begin our analysis by setting forth the applicable legal principles. "The principles governing the admission of potentially inflammatory photographic evidence are clear. . . . [W]e adhere to the general rule that photographs which have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry are not rendered inadmissible simply because they may be characterized as gruesome. . . . When, however, an initial determination is made by the trial court that such photographs may have the tendency to prejudice or inflame the jury, the admissibility of such evidence is dependent upon the trial court's determination as to whether their value as evidence outweighs their possible prejudicial effect. . . . Since the trial court exercises its broad discretion in such circumstances, its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown." (Internal quotation marks omitted.) State v. Howard, 88 Conn.App. 404, 427, 870 A.2d 8, cert. denied, 275 Conn. 917, 883 A.2d 1250 (2005).
In the present case, the court did not abuse its discretion in admitting the photographs of the victim's injuries into evidence. First, the court found that the photographs were relevant because they *709 would help the jury to decide whether the victim accidentally had caused the injuries to herself. The defendant, however, did not object to the relevance of the photographs. The defendant objected that the photographs were more prejudicial than probative. The court held that the photographs, while graphic, were more probative than prejudicial. We agree.
The photographs were probative of the intent to disfigure, which was one of the elements of the assault charge against the defendant.[3] The photographs depicted the victim's injuries. Moreover, although the victim and physicians could testify about the nature of the wounds, photographs could depict the extent and painfulness of the victim's injuries. The seriousness of the injuries would be relevant in proving the defendant's intent to disfigure or even his intent to kill, which was an element of the charge of attempt to commit murder. See General Statutes §§ 53a-54a(a) and 53a-49. This court has held that "[p]otentially inflammatory photographs may be admitted into evidence if the court, in its discretion, determines that the probative value of the photographs outweighs any potential prejudice. . . . [E]ven photographs depicting gruesome scenes that may prejudice the jury are admissible, so long as, in the court's discretion, they are more probative than prejudicial." (Internal quotation marks omitted.) State v. Pearson, 97 Conn.App. 414, 425, 904 A.2d 1259, cert. denied, 280 Conn. 934, 909 A.2d 963 (2006).
Additionally, the defendant objected to the admission of the photographs on the ground that there were too many of them. The photographs, however, were not cumulative. They depicted several different places on the victim's body where she was burned and different stages of the healing, namely, when the burns first occurred and after the wounds had scarred. Furthermore, the court gave a limiting instruction to the jury prior to the introduction of the photographs by the state. The court cautioned the jury not to allow the photographs to instill feelings of sympathy for the victim or prejudice against the defendant. See State v. Howard, supra, 88 Conn.App. at 427-28, 870 A.2d 8 (court did not abuse discretion in admitting into evidence sixteen autopsy photographs of victim). In the present case, the photographs admitted into evidence, while gruesome and numerous, were relevant and more probative than prejudicial. We therefore conclude that the court did not abuse its discretion in admitting the photographs into evidence.

II
The defendant next claims that the court's abuse of discretion regarding evidentiary admissions deprived him of a fair trial. The defendant claims that the court improperly admitted uncharged misconduct evidence, "syndrome" evidence and graphic photographs of the victim's injuries. As a result, the defendant claims, the trial lacked fundamental fairness.
The defendant did not preserve this due process claim at trial for appellate review. Therefore, he is seeking review under Golding. In State v. Golding, supra, 213 Conn. at 233, 567 A.2d 823, the court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is *710 of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., at 239-40, 567 A.2d 823. At the same time, "[t]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right. . . .
"[U]npreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed. . . . We previously have stated that the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." (Citations omitted; internal quotation marks omitted.) State v. Gerald W., 103 Conn.App. 784, 798, 931 A.2d 383, cert. denied, 284 Conn. 933, 935 A.2d 152 (2007).
We previously concluded in part I that the court properly admitted evidence of the defendant's prior uncharged misconduct and of the photographs of the victim's injuries. Furthermore, we conclude that the defendant's claim regarding the "syndrome" evidence is not of constitutional magnitude. The defendant argues, in essence, that the repeated use of the word "circle" introduced a type of "syndrome" evidence into the trial without the benefit of expert testimony on the subject. We disagree. The victim used the word "circle" several times during her testimony to describe the cyclical nature of her relationship with the defendant, in that they would argue, she would stay away from him for a period of time and they would eventually get back together. The state did not present any evidence of a "syndrome." Furthermore, the defendant was given the opportunity to cross-examine the victim after she testified regarding the cyclical nature of her relationship with him. Therefore, this claim is purely an evidentiary claim, not a constitutional claim. The fact that the court allowed the victim to describe her relationship as a "circle" did not implicate any constitutional rights of the defendant. As such, we decline to review the defendant's unpreserved evidentiary claim. Additionally, we previously concluded that the court properly admitted evidence of the defendant's prior uncharged misconduct and the photographs of the victim's injuries. Not one of these evidentiary claims rises to the level of a constitutional claim. As such, three evidentiary claims aggregated do not rise to the level of a deprivation of the defendant's constitutional rights. See State v. Robinson, 227 Conn. 711, 747, 631 A.2d 288 (1993).

III
Finally, the defendant claims that the court deprived him of a fair trial by permitting testimony of a "circle of violence" syndrome without any expert testimony. Specifically, he argues that the court deprived him of his sixth amendment right to cross-examine and to confront witnesses against him and to present a defense. We decline to review this claim. "It is well established that generally this court will not review claims that were not properly preserved in the trial court. . . . A defendant may prevail on a claim of constitutional error not preserved at trial, however, if the defendant satisfies the four part standard set forth in State v. Golding [supra, 213 Conn. at 239-40, 567 A.2d *711 823]." (Internal quotation marks omitted.) State v. Spillane, supra, 69 Conn.App. at 341, 793 A.2d 1228. "Where a defendant fails to seek review of an unpreserved claim under either Golding or the plain error doctrine, this court will not examine such a claim." (Internal quotation marks omitted.) Id. In the present case, the defendant neither preserved the claim at trial, nor requested review of the claim under Golding or the plain error doctrine. Therefore, we decline to review the claim.
The judgment is affirmed.
In this opinion the other judges concurred.
NOTES
[1] General Statutes § 53a-92(a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . or (C) terrorize him or a third person. . . ."

The defendant was charged under two alternate theories of committing kidnapping. The jury received a unanimity instruction and returned a general verdict.
[2] We decline to identify the victim or others through whom the victim may be identified in the interest of protecting the privacy interests of the victim.
[3] General Statutes § 53a-59(a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person. . . ."